[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2011
JOHN LEY
CLERK

No. 09-16438
_____

D. C. Docket No. 05-01707-CV-T-27TBM

PEEK-A-BOO LOUNGE OF BRADENTON, INC.,
a Florida Corporation d.b.a. Peek-A-Boo Lounge,

Plaintiff-Appellant,

versus

MANATEE COUNTY, FLORIDA,
a political subdivision of the
State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 21, 2011)

Before HULL and MARCUS, Circuit Judges, and COOKE,[*] District Judge.

_____

[*] Honorable Marcia G. Cooke, United States District Judge for the Southern District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

At issue today is the constitutionality of an ordinance that the Manatee County, Florida Board of County Commissioners ("the Board") adopted to regulate sexually oriented businesses in Manatee County ("the County"). Peek-a-Boo Lounge of Bradenton, Inc. ("Peek-a-Boo"), an adult dancing establishment in Manatee County, along with two similar establishments,[1] sued the County claiming that the ordinance violated the First Amendment. Peek-a-Boo appeals the district court's grant of summary judgment in favor of the County. After thorough review of the ordinance and the extensive record surrounding its codification, we agree with the district court that the County's ordinance was reasonably designed to serve a substantial government interest -- reducing the negative secondary effects associated with sexually oriented businesses. Accordingly, we affirm.

I.

The story begins in 1987, when Manatee County adopted an "Adult Entertainment Code," Ordinance 87-07 (not at issue today), which rendered then-existing adult dancing establishments Peek-a-Boo and M.S. Entertainment, Inc. ("M.S.") nonconforming. Peek-a-Boo and M.S. filed suit in the United States District Court for the Middle District of Florida challenging the ordinance's

---

[1] The other two adult dancing establishments, M.S. Entertainment, Inc. and G.T. Management, Inc., originally joined the appeal but abandoned it before the case came before us.

constitutionality under the First Amendment. But in 1989, the parties settled their dispute, allowing the two establishments to continue running and enjoining the County from enforcing the ordinance against them for the way they then operated.

In November 1998, the County amended the Adult Entertainment Code, this time enacting a zoning ordinance, Ordinance 98-46 (also not at issue today), which set forth specific physical requirements for the premises of adult dancing establishments. Peek-a-Boo and M.S. again found themselves in violation of the Adult Entertainment Code. Four months later, the County also adopted a generally applicable public nudity ordinance, Ordinance 99-18. This ordinance defined "nudity" broadly, to include the wearing of any opaque swimsuit or lingerie covering less than one-third of the buttocks or one-fourth of the female breast. The ordinance also specifically prohibited erotic dancers and others from appearing in public in "G-strings, T-backs, dental floss, and thongs."

Peek-a-Boo and M.S. again sued the County, challenging the constitutionality of both ordinances on First Amendment grounds. The district court concluded that the ordinances were constitutional and granted summary judgment in favor of the County. A panel of this Court, however, reversed, holding that the zoning ordinance violated the First Amendment and that there were genuine issues of material fact concerning whether the public nudity

ordinance furthered the County's interest in curbing the negative secondary effects associated with adult entertainment. Peek-a-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 337 F.3d 1251, 1268-69, 1274 (11th Cir. 2003) ("Peek-a-Boo I"). Essential to our finding that the ordinance was unconstitutional, we observed that the Board "failed to rely on any evidence whatsoever that might support the conclusion that the ordinance was narrowly tailored to serve the County's interest in combating secondary effects." Id. at 1266. We also found that, while the County relied on some evidence to meet its initial burden in adopting Ordinance 99-18, the public nudity ordinance, the plaintiffs had then met their burden of submitting evidence sufficient to "cast direct doubt" on the County's rationale. Id. at 1271-72. Accordingly, we remanded the case to the district court for a determination of whether there remained credible evidence upon which the County could reasonably rely to support its stated rationale for the public nudity ordinance. Id. at 1274-75.

After the Peek-a-Boo I decision, the County completely overhauled its Adult Entertainment Code. It enacted Ordinance 05-21[2] -- the ordinance at issue

_____

[2] The relevant portions of the ordinance provide:

> Sec. 2-2.5-2. Definitions.
> . . . .
> "*Nude*," "*Nudity*" or "*State of Nudity*" means the showing of the human male or female genitals, pubic area, vulva, or anus with less than a fully opaque covering, or the showing of the female breast

4

with less than a fully opaque covering of any part of the nipple and areola.

. . . .

"*Semi-Nude*" or "*State of Semi-Nudity*" means a condition in which a person is not nude, but is showing a majority of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or is showing the majority of the male or female buttocks.

. . . .

"*Sexually Oriented Business*" means an "adult bookstore," an "adult video store," an "adult cabaret," an "adult motel," an "adult motion picture theater," a "semi-nude model studio," a "sexual device shop," or a "sexual encounter center."

. . . .

Sec. 2-2.5-13. Hours of Operation.

No sexually oriented business, other than an adult motel, shall be or remain open for business between 2:00 a.m. and 6:00 a.m. on any day.

. . . .

Sec. 2-2.5-16. Penalties and enforcement.

(a) A person who knowingly violates, disobeys, omits, neglects, or refuses to comply with any of the provisions of this chapter shall, upon conviction, be punished by a fine in an amount not less than $250.00 and not to exceed $500.00, or imprisonment, in the County Jail for a period not to exceed sixty (60) days, or both. Each day a violation is committed, or permitted to continue, shall constitute a separate offense and shall be penalized as such.

. . . .

Sec. 2-2.5-17. Applicability to existing businesses.

(a) All existing sexually oriented businesses and sexually oriented business employees are hereby granted a *De Facto* Temporary License to continue operation or employment for a period of ninety (90) days following the effective date of this ordinance. Compliance with this ordinance shall not be required during said ninety (90) days, but by the end of said ninety (90) days, all sexually oriented businesses and sexually oriented business employees must conform to and abide by the requirements of this chapter.

(b) Notwithstanding any language in Manatee County Ordinance No. 99-18 to the contrary, sexually oriented businesses shall be subject to this ordinance and shall not be subject to Ordinance No. 99-18.

Sec. 2-2.5-18. Prohibited activities.

It is unlawful for a sexually oriented business licensee to knowingly violate the following regulations or to knowingly allow an employee

today -- renaming the code the "Sexually Oriented Business Code," and establishing a different set of regulations to govern the manner in which sexually oriented businesses operate in the County. The new ordinance contains both zoning and public nudity provisions.[3] The zoning provisions include physical requirements for the premises of sexually oriented businesses, restrictions on their hours of operation, and a prohibition on serving alcoholic beverages. Manatee

---

or any other person to violate the following regulations.

(a) It shall be a violation of this ordinance for a patron, employee, or any other person to knowingly or intentionally, in a sexually oriented business, appear in a state of nudity.

(b) It shall be a violation of this ordinance for a person to knowingly or intentionally, in a sexually oriented business, appear in a semi-nude condition unless the person is an employee who, while semi-nude, remains at least six (6) feet from any patron or customer and on a stage that is at least eighteen (18) inches from the floor and in a room of at least one thousand (1,000) square feet.

(c) It shall be a violation of this ordinance for any employee who regularly appears semi-nude in a sexually oriented business to knowingly or intentionally, in a sexually oriented business, touch a customer or the clothing worn by a customer.

(d) It shall be a violation of this ordinance for any person to sell, use, or consume alcoholic beverages on the premises of a sexually oriented business. A sexually oriented business currently licensed to sell alcoholic beverages on the premises shall not be required to comply with this requirement until expiration of its current annual alcoholic beverage license.

A sign in a form to be prescribed by the County Administrator's Office and summarizing the provisions of Subsections (a), (b), (c), and (d) of this Section, shall be posted near the entrance of the sexually oriented business in such a manner as to be clearly visible to patrons upon entry.

[3] The new ordinance replaced the previous zoning ordinance, Ordinance 98-46, and exempted sexually oriented businesses from the generally applicable public nudity ordinance, Ordinance 99-18, rendering the prior action -- Peek-a-Boo I -- moot.

County, Fla., Code of Ordinances §§ 2-2.5-4 - 2-2.5-18 (2005). The nudity provisions include an across-the-board ban on appearing in a "state of nudity," id. § 2-2.5-18(a), defined as "the showing of the human male or female genitals, pubic area, vulva, or anus with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola," id. § 2-2.5-2. The ordinance allows employees of sexually oriented businesses to appear "semi-nude," id. § 2-2.5-18(b), defined as "a condition in which a person is not nude, but is showing a majority of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or is showing the majority of the male or female buttocks," id. § 2-2.5-2. Employees appearing semi-nude, however, must "remain[] at least six (6) feet from any patron or customer and on a stage that is at least eighteen (18) inches from the floor and in a room of at least one thousand (1,000) square feet." Id. § 2-2.5-18(b). Employees are prohibited from touching customers or customers' clothing. Id. § 2-2.5-18(c).

Unlike when the County adopted Ordinances 98-46 and 99-18, this time the County relied on a voluminous record that included judicial opinions; multiple secondary-effects reports, including land-use studies and crime reports; affidavits from a local private investigator and from local police; newspaper articles; and

7

other materials. The County conducted a four-hour public hearing at which experts testified both for and against the ordinance. In support of the County's proposal, Richard McCleary, Ph.D., a professor of criminology, and Shawn Wilson, a real estate appraiser, testified about the adverse secondary effects associated with sexually oriented businesses. In opposition, the Plaintiffs offered the testimony of four experts: Randy D. Fisher, Ph.D., an associate professor of psychology; Terry A. Danner, Ph.D., a professor of criminal justice; Judith Lynne Hanna, Ph.D., a scholar of anthropology and dance; and Richard Schauseil, a licensed real estate agent. We detail the evidential foundation at some length because it stands at the heart of whether the County relied on a sufficient record.

Dr. McCleary testified that much of the evidence supported the County's rationale. He explained that the formal criminological literature revealed consistent findings of significant crime-related hazards caused by sexually oriented businesses. These findings led him to conclude that "the relationship between crime and sexually oriented businesses is . . . a scientific fact." One reason, he offered, is that sexually oriented businesses attract "soft targets," meaning patrons who are easy crime targets because they often come from far away, do not know the neighborhood, try to remain anonymous, and are less likely to report crimes of borderline seriousness because they do not want anyone to know that they are

8

patronizing such businesses. Another reason Dr. McCleary offered is that features of the physical layout of these businesses -- including private rooms and narrow corridors -- strongly inhibited surveillance and policing.

Dr. McCleary also explained that there were between one and two dozen studies establishing a correlation between sexually oriented businesses and negative secondary effects that were "scientific to some degree." Dr. McCleary highlighted two such studies that supported the County's findings that sexually oriented businesses cause negative secondary effects. In the first one from Garden Grove, California, Dr. McCleary and a colleague examined locations where new sexually oriented businesses had opened up and compared the crime rates one year before and one year after they opened, using existing sexually oriented businesses as controls. They found a far greater increase in crime during that time period surrounding the new sexually oriented businesses than surrounding the existing similar businesses. In the second study drawn from Greensboro, North Carolina, even though the study's authors concluded that sexually oriented businesses did not cause negative secondary effects, Dr. McCleary said that another look at their data showed significantly higher rates of crime in neighborhoods with sexually oriented businesses.

Shawn Wilson, a real estate appraiser, testified about the negative effects of

9

sexually oriented businesses on property value. Ms. Wilson explained that she had examined studies drawn from other cities on the secondary effects associated with sexually oriented businesses and that all of the studies addressing the value of real estate concluded that there were, in fact, negative secondary effects. Ms. Wilson also looked at the deeds in her own files, spoke with market participants, and met with other real estate appraisers. Although she acknowledged that these conversations amounted to anecdotal evidence, she concluded that there was a palpable fear in the marketplace that sexually oriented businesses, like other undesirable businesses such as flea markets and bowling alleys, would drive away potential customers and adversely affect business.

Dr. Fisher, an associate professor of psychology, testified on behalf of the Plaintiffs that the foreign studies on which the County had relied were flawed. He said that five of the studies were not empirically grounded, six did not actually find evidence of negative secondary effects, and two involved samples that were too small to be considered. He conceded that five of the foreign studies supported the hypothesis that sexually oriented businesses caused negative secondary effects, but he suggested that each of them contained methodological flaws that rendered the results "virtually uninterpretable." Finally, he critiqued two studies Dr. McCleary had personally conducted -- the Garden Grove study, as well as a 2004 study of

10

Centralia, Washington. Dr. Fisher argued that Dr. McCleary was not actually measuring crime increases surrounding <u>new</u> sexually oriented businesses, because some of these new businesses had opened near <u>existing</u> sexually oriented businesses.

Dr. Danner, a criminal justice professor, testified that a study he conducted concluded that Manatee County's sexually oriented businesses did not cause increases in crime. He evaluated two kinds of crime data in the County: (1) calls for police service, and (2) crimes known to police. He compared crime data for the neighborhoods surrounding Peek-a-Boo Lounge and Cleopatra's (the name of the adult dancing establishment of the former Plaintiff M.S.) with crime data from other parts of the County. He found that Cleopatra's had significantly fewer incidents of the categories of crime he studied compared to the average for Manatee County, and that Peek-a-Boo had significantly more incidents of those crimes compared to the average. Because Peek-a-Boo had more crime than the County average and Cleopatra's had less crime than the County average, and because he found that other kinds of businesses are also correlated with negative secondary effects, Dr. Danner argued that sexually oriented businesses were not "uniquely criminogenic."

Dr. Hanna, an anthropology and dance scholar, also spoke on the Plaintiffs'

11

behalf. She opined that the ordinance was not content neutral and would suppress speech by depriving dancers of "artistic choice." She offered that nudity and the touching of patrons are essential components of adult dance and that the ordinance "stigmatizes women."

Next, Mr. Schauseil, a real estate agent, testified about a study he had conducted regarding property value. He found that from 2000 to 2004, the majority of businesses in the neighborhood of Cleopatra's and Peek-a-Boo Lounge saw no change in traffic pattern and the traffic volume had, in fact, increased.

Finally, Robert Miller, a Manatee County resident who had worked at Cleopatra's for two years and at Peek-a-Boo Lounge for eleven years, testified. He claimed that Peek-a-Boo did not tolerate drugs, prostitution, or violence; that there had been few "legal incidents"; that Peek-a-Boo was in good standing with the community; and that the establishment contributed significantly to the economy.

Based on the evidence and testimony, the Board concluded that sexually oriented businesses were correlated with a variety of negative secondary effects, including personal crimes, property crimes, prostitution and other illicit sexual activity, spread of disease, drug use and drug trafficking, sexual assault and exploitation, negative impacts on surrounding properties, and litter. Manatee County, Fla., Code of Ordinances § 2-2.5-1(b)(1). The Board found that the

12

County had a substantial interest in preventing and abating these secondary effects, and therefore adopted the ordinance "to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the County, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the County." Id. § 2-2.5-1(a).

On September 12, 2005, three adult dancing establishments filed the instant action: the two plaintiffs from the previous action, Peek-a-Boo and M.S., and G.T. Management, Inc. ("G.T."). Again, the Plaintiffs claimed that the ordinance was unconstitutional on its face and as applied to them. The County moved for summary judgment, submitting six volumes of evidence, which included the testimony and reports of Dr. McCleary, Shawn Wilson, and the Plaintiffs' witnesses; twenty-five judicial opinions; twenty studies from other jurisdictions; deposition testimony; affidavits; and post-enactment evidence. In particular, the County submitted affidavits from Tom McCarren, who visited Peek-a-Boo Lounge, Paper Moon,[4] and Pandora's Box[5] and described in detail illegal activity

_____

[4] The name of the adult dance establishment of the former Plaintiff G.T.

[5] The new name of the adult dance establishment of the former Plaintiff M.S., formerly Cleopatra's.

13

taking place in these establishments.[6]

The County also submitted an affidavit from Detectives Evelio Perez and Dave Ackerson of the County Sheriff's Office, who conducted an undercover operation at Cleopatra's. They averred that the sting revealed several liquor violations, including serving alcohol after hours, dealing in stolen property, and vending goods with a counterfeit trademark. The County also submitted newspaper articles about stings in North Miami Beach and Pasco County. These articles detailed the illegal acts purportedly taking place in the adult clubs, including exposure of bodily organs on stage, simulation of sexual acts, and drug possession. The County also submitted a report about erotic dancers' experiences in adult clubs, which claimed that there was evidence of physical abuse, sexual abuse, verbal abuse, stalking, and sexual exploitation. In response, the Plaintiffs offered affidavits from the four witnesses whose testimony had been presented to the Board, and argued that their evidence "cast direct doubt" on the County's rationale for the ordinance. Ultimately, the district court granted final summary judgment for the County. All the Plaintiffs timely appealed, and the County cross appealed from the district court's refusal to strike the Plaintiffs' affidavits on the

---

[6] At Pandora's Box, Mr. McCarren was able to pay a dancer for a private dance, during which the dancer removed the tape over one of her nipples and allowed Mr. McCarren to touch her breast, buttocks, and genital area. At Paper Moon, Mr. McCarren was able to pay a dancer to go into a back room with him, where she removed all clothing except her G-string and allowed Mr. McCarren to touch her breasts.

grounds that they contained legal argument and previously undisclosed expert opinion. Two of the Plaintiffs (M.S. and G.T.) have since dropped their appeal, leaving only Peek-a-Boo as a party Plaintiff.

II.

We review a district court's order granting summary judgment de novo, "applying the same standard that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to" the non-moving party. Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of production. Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007). The constitutionality of a statute is a question of law we review de novo. Peek-a-Boo I, 337 F.3d at 1255.

In Peek-a-Boo I, a panel of this Court comprehensively summarized the Supreme Court's jurisprudence on the First Amendment right to freedom of expression in the context of adult entertainment. Id. at 1255-64. Among other things, we held that adult entertainment zoning ordinances and generally applicable public nudity ordinances "must be distinguished and evaluated separately" according to the respective standards established by the Supreme Court. Id. at

15

1264.  Zoning ordinances that regulate the conditions under which sexually oriented businesses may operate are evaluated as time, place, and manner regulations, following a three-part test set forth by the Supreme Court in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-50 (1986) and reaffirmed in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 448 (2002).[7]  Content-neutral public nudity ordinances, by contrast, involve expressive conduct and must therefore be measured against a four-part test set forth in United States v. O'Brien, 391 U.S. 367, 376-77 (1968), and applied in the context of adult entertainment in Barnes  v. Glen Theatre, Inc., 501 U.S. 560, 567 (1991), and in City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000).  Manatee County Ordinance 05-21 contains provisions that regulate zoning and portions that are generally applicable public nudity restrictions.  In this case, however, it's unnecessary to analyze these provisions separately because Peek-a-Boo challenges on appeal only whether the ordinance is "designed to serve a substantial government interest."[8]  Therefore, we

_____

[7] There was no majority opinion in Alameda Books, but because Justice Kennedy's concurrence reached the judgment on the narrowest grounds, his opinion represents the Supreme Court's holding in that case. See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds" (internal quotation marks omitted)).

[8] Under the Renton test applicable to zoning ordinances, a reviewing court must determine: (1) whether the ordinance amounts to a total ban (presumptively invalid) or merely a time, place, and manner regulation; (2) if it is a time, place, and manner regulation, the court must decide whether the ordinance is subject to strict or intermediate scrutiny; and (3) if it is subject to intermediate scrutiny, then the court must determine whether it is "designed to serve a

16

measure the zoning and nudity portions of the ordinance against the same standard: is the ordinance reasonably designed to serve a substantial government interest?

In determining whether the ordinance meets this standard, the county or municipality first bears the initial burden of producing the evidence that it has relied on to reach the conclusion that the ordinance furthers its interest in reducing secondary effects. Daytona Grand, Inc. v. City of Daytona Beach, 490 F.3d 860, 875 (11th Cir. 2007) (citing Peek-a-Boo I, 337 F.3d at 1269). If the governmental entity has produced "evidence that it reasonably believed to be relevant to its rationale for enacting the ordinance," then the burden shifts to the plaintiff to "cast direct doubt on this rationale," either by showing that the evidence does not support its rationale or by producing evidence disputing the local government's factual findings. Id. at 875-76 (internal quotation marks omitted). If the plaintiff

substantial government interest" and allows for reasonable alternative channels of communication. Peek-a-Boo I, 337 F.3d at 1264 (citing Renton, 475 U.S. at 46-50; Alameda Books, 535 U.S. at 448 (Kennedy, J., concurring in the judgment)). But under the O'Brien-Barnes test for public nudity ordinances, a reviewing court must determine whether: (1) the government acted within the bounds of its constitutional power in enacting the ordinance; (2) the ordinance furthers a "substantial government interest"; (3) "the government interest is unrelated to the suppression of free expression"; and (4) the ordinance restricts First Amendment freedoms no more than is essential to further the government's interest. O'Brien, 391 U.S. at 377; Barnes, 501 U.S. at 567 (quoting O'Brien, 391 U.S. at 376-77). We have concluded that the same standard is used to determine whether an ordinance "is designed to serve" the government's interest (Renton step 3) or "furthers" the government's interest (O'Brien step 2). Peek-a-Boo I, 337 F.3d at 1264-65. On appeal, Peek-a-Boo only disputes whether the County satisfies Renton step 3; notably, Peek-a-Boo does not deny that combating negative secondary effects associated with adult entertainment is a substantial government interest. Because Peek-a-Boo only challenges the requirement that is common to both tests, there is no need to analyze the zoning and nudity portions of the ordinance separately.

17

sustains its burden, the burden shifts back to the government to supplement the record with evidence renewing support for a theory that justifies the ordinance. Id. at 876.

On this record, we are satisfied that the County has met its initial burden and that Peek-a-Boo has failed to cast direct doubt. While the County "cannot rely on shoddy data or reasoning," Peek-a-Boo I, 337 F.3d at 1269, it is not required to "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the [County] relie[d] upon is reasonably believed to be relevant to the problem that the [County] addresses," Renton, 475 U.S. at 51-52. Nor was the County required to produce empirical evidence or scientific studies as long as it "advance[d] some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Alameda Books, 535 U.S. at 449 (Kennedy, J., concurring in the judgment). Here, the County relied on a vast legislative record that included judicial opinions, reports and studies that had been prepared for other municipalities, testimony from expert witnesses, affidavits from a private investigator who visited sexually oriented businesses in Manatee County, and newspaper articles. It is undeniable that the County has made a substantial showing, relying on as thorough a record as we

18

have seen in these cases, and far more than the "very little evidence" required under Alameda Books. 535 U.S. at 451 (Kennedy, J., concurring in the judgment). Moreover, Peek-a-Boo has failed to cast direct doubt on the totality of the County's evidence.

*A. The County's Initial Burden*

To begin with, Manatee County has produced a substantial body of evidence, which it reasonably believed to be relevant to combating negative secondary effects. The County explained that its rationale was to reduce a variety of negative secondary effects associated with sexually oriented businesses:

> Sexually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, public safety risks, prostitution, potential spread of disease, lewdness, public indecency, illicit sexual activity, illicit drug use and drug trafficking, undesirable and criminal behavior associated with alcohol consumption, negative impacts on surrounding properties, litter, and sexual assault and exploitation. . . . Each of the foregoing negative secondary effects constitutes a harm which the County has a substantial government interest in preventing and/or abating in the future.

Manatee County, Fla., Code of Ordinances § 2-2.5-1(b)(1)-(2). In support of its rationale, the County first has cited to the findings and interpretations of eight Supreme Court decisions and seventeen other federal and state court decisions.[9]

--------

[9] Manatee County has specifically referenced these cases: City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004); Alameda Books, 535 U.S. 425; Pap's A.M., 529 U.S. 277; Barnes, 501 U.S. 560; FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990); Renton, 475 U.S. 41; Young v. Am. Mini Theatres, Inc., 427 U.S. 50 (1976); California v. LaRue, 409 U.S. 109

19

Many of the cases upheld ordinances containing restrictions similar to those found in Ordinance 05-21, and many of them accepted legislative findings concerning the negative secondary effects of adult businesses. See, e.g., Barnes, 501 U.S. at 572 (upholding requirement that dancers in adult establishments wear pasties and a G-string); California v. LaRue, 409 U.S. 109, 118-19 (1972) (upholding prohibitions on nude dancing in establishments that serve alcohol); Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1365-66 (11th Cir. 1999) (upholding a requirement that adult establishments have an area of at least 1,000 square feet). Indeed, the Supreme Court has suggested in Pap's A.M. that a municipality may meet its initial burden solely by relying on relevant Supreme Court cases. 529 U.S. at 296-97.

Here, however, the County has also relied on twenty studies (many of which were empirical) conducted in other cities, again examining the nexus between

(1972); Gammoh v. City of La Habra, 395 F.3d 1114 (9th Cir. 2005); World Wide Video of Wash., Inc. v. City of Spokane, 368 F.3d 1186 (9th Cir. 2004); Peek-a-Boo I, 337 F.3d 1251; Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702 (7th Cir. 2003); Gary v. City of Warner Robins, 311 F.3d 1334 (11th Cir. 2002); BZAPS, Inc. v. City of Mankato, 268 F.3d 603 (8th Cir. 2001); Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306 (11th Cir. 2000); Wise Enters. v. Unified Gov't of Athens-Clarke Cnty., 217 F.3d 1360 (11th Cir. 2000); Ward v. Cnty. of Orange, 217 F.3d 1350 (11th Cir. 2000); David Vincent, Inc. v. Broward Cnty., 200 F.3d 1325 (11th Cir. 2000); Boss Capital, Inc. v. City of Casselberry, 187 F.3d 1251 (11th Cir. 1999); Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999); Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993 (11th Cir. 1998); Int'l Food & Beverage Sys. v. City of Ft. Lauderdale, 794 F.2d 1520 (11th Cir. 1986); Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943 (11th Cir. 1982); Lady J. Lingerie, Inc. v. City of Jacksonville, 973 F. Supp. 1428 (M.D. Fla. 1997); and Bd. of Cnty. Comm'rs v. Dexterhouse, 348 So.2d 916 (Fla. Dist. Ct. App. 1977).

sexually oriented businesses and negative secondary effects.[10]  The studies found, among other things: a higher incidence of arrests for sex offenses in neighborhoods surrounding sexually oriented businesses as compared with control areas (Phoenix, Arizona 1979); a higher incidence of sex-related crimes near sexually oriented businesses as compared with control areas (Indianapolis, Indiana 1984; Austin, Texas 1986); a real association between sexually oriented businesses and elevated crime levels (Minneapolis, Minnesota 1980; Indianapolis, Indiana; Amarillo, Texas 1977; Whittier, California 1978; Seattle, Washington 1989); a correlation between sexually oriented businesses and lower property values (Seattle, Washington); survey data from real estate appraisers who opined that sexually oriented businesses would have a negative effect on property values (Los Angeles, California 1977; Oklahoma City, Oklahoma 1986; Dallas, Texas 1997); and testimony from citizens who were afraid to walk the streets in areas with a high concentration of sexually oriented businesses (Los Angeles, California).

The County also referenced findings that dancers at sexually oriented businesses experience physical and sexual abuse, drawn from a paper entitled

_____

[10] These studies were conducted in Phoenix, Arizona 1979; Minneapolis, Minnesota 1980; Houston, Texas 1997; Indianapolis, Indiana 1984; Amarillo, Texas 1977; Garden Grove, California 1991; Los Angeles, California 1977; Whittier, California 1978; Austin, Texas 1986; Seattle, Washington 1989; Oklahoma City, Oklahoma 1986; Dallas, Texas 1997; Newport News, Virginia 1996; New York, New York 1994; Phoenix, Arizona 1995-1998; Centralia, Washington 2004; Greensboro, North Carolina 2003; Houston, Texas 1983; Louisville, Kentucky 2004; and the State of Minnesota 1989.

"Stripclubs According to Strippers: Exposing Workplace Sexual Violence" by Kelly Holsopple, the Program Director of the Freedom and Justice Center for Prostitution Resources in Minneapolis, Minnesota; the affidavits of Tom McCarren, detailing illegal activity taking place inside sexually oriented businesses in Manatee County, including illegal touching in private rooms; an affidavit from Detectives Evelio Perez and Dave Ackerson of the Manatee County Sheriff's Office, who conducted an undercover operation at Cleopatra's revealing several liquor violations, including serving alcohol after hours, dealing in stolen property, and vending goods with a counterfeit trademark; and newspaper articles about stings conducted in North Miami Beach and Pasco County, which detailed a variety of illegal acts taking place in sexually oriented businesses. This ample foundation is more than enough to sustain the County's initial burden under the second prong of the O'Brien test and the third prong of the Renton test.

*B. Peek-a-Boo's Burden to Cast Direct Doubt*

Since the County has produced evidence that it reasonably believed to be relevant to its rationale, the burden shifts to Peek-a-Boo to cast direct doubt on the County's rationale, either by showing that the County's evidence does not actually support its rationale or by producing evidence disputing the County's factual findings. Daytona Grand, 490 F.3d at 875. Peek-a-Boo has not met this burden.

22

In the first place, Peek-a-Boo argues that it was "extremely problematic" to use judicial opinions as evidence because of "the unreliability of judicial decisions as proof of facts," citing to Lawrence v. Texas, 539 U.S. 558, 570 (2003), as well as a Fifth Circuit decision, H & A Land Corp. v. City of Kennedale, 480 F.3d 336 (5th Cir. 2007), which Peek-a-Boo claims misstated a fact regarding a study it had cited. But the suggestion that the County may not reasonably rely on judicial opinions as evidence has been squarely rejected by this Court in Peek-a-Boo I, where we held that "any evidence . . . including a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion -- may form an adequate predicate to the adoption of a secondary effects ordinance." 337 F.3d at 1268 (emphasis added).

Second, Peek-a-Boo faults the County for omitting pages from two of the documents it submitted. However, Peek-a-Boo has raised this argument only for the first time on appeal. We generally do not consider arguments raised for the first time on appeal, and we decline to do so here. Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1215 n.8 (11th Cir. 2010).

Third, Peek-a-Boo claims that four of the studies prepared for other cities -- those conducted in Indianapolis in 1984, Austin in 1986, Oklahoma City in 1986, and Los Angeles in 1977 -- contained opinion surveys and were "problematic, if

23

not inadmissible before the Courts." Peek-a-Boo does not explain this, however, only citing to a 1978 Third Circuit opinion, Pittsburgh Press Club v. United States, 579 F.2d 751, 759 (3d Cir. 1978), and a 1963 opinion from the Southern District of New York, Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 681-82, 684 (S.D.N.Y. 1963). We remain unpersuaded. There is no precedent that bars a county from relying on studies that are not empirical in nature. See Daytona Grand, 490 F.3d at 881 ("[Plaintiff's argument] essentially asks this Court to hold today that the City's reliance on anything but empirical studies based on scientific methods is unreasonable. This was not the law before Alameda Books, and it is not the law now.") What's more, the cases Peek-a-Boo cites are inapposite because they address the admissibility in court of opinion polls under the hearsay rule. See Pittsburgh Press Club, 579 F.2d at 759-60; Zippo Mfg. Co., 216 F. Supp. at 681-84. In this case, the question is whether the County reasonably believed the evidence to be relevant to its rationale in adopting the ordinance. Cf. Peek-a-Boo I, 337 F.3d at 1268.

The heart of Peek-a-Boo's attack is found in the affidavits proffered by its experts Dr. Fisher, Dr. Danner, and Mr. Schauseil. Dr. Fisher's affidavit claimed that the foreign studies on which the County relied are defective. Dr. Fisher, however, only challenged the findings of seventeen of the foreign studies. Neither

24

Dr. Fisher nor any of the Plaintiff's experts say anything about three foreign studies -- namely, Houston, Texas 1983; the State of Minnesota 1989; and Louisville, Kentucky 2004. The 1983 Houston report details the findings the Houston City Council reached after a total of eight public hearings. The City Council found that sexually oriented businesses were associated with negative secondary effects such as a detrimental effect on property value and quality of life, increased prostitution in at least one area, intrusive signage, and ancillary criminal activity. The State of Minnesota report includes the findings of an empirical study conducted in St. Paul in 1978 of sexually oriented businesses and businesses serving alcohol. The study found a statistically significant correlation between the location of these types of businesses and neighborhood deterioration, as well as an association with higher crime rates and reduced housing values. Minnesota's working group on sexually oriented businesses also heard testimony that neighborhoods with a concentration of sexually oriented businesses suffered adverse effects such as finding pornographic materials and condoms in the streets, sex acts with prostitutes occurring in plain view of families and children, and harassment of neighborhood residents, including the propositioning of young girls and women on their way to school and work. Finally, the study from Louisville included police reports about prostitution and the promotion of prostitution, and

25

the possession of methamphetamines, marijuana, and unknown white pills at or about adult entertainment establishments.

Beyond failing to challenge these studies at all, neither Dr. Fisher nor the Plaintiff's other experts has directly addressed the twenty-five judicial opinions relied upon by the County. Nor do the Plaintiff's experts attempt to cast any direct doubt on the affidavits submitted by the private investigator and two police officers detailing illegal activities found in the County's sexually oriented businesses, or comment at all about the report detailing sexual violence against dancers in sexually oriented businesses. Finally, the Plaintiff's experts have not addressed the newspaper articles regarding stings at Florida strip clubs. In short, a substantial body of evidence remains wholly unaddressed by the Plaintiff.

Moreover, Dr. Fisher's criticism of seventeen studies neither invalidates them nor renders the County's reliance on them unreasonable. Dr. Fisher criticizes some of the studies (Phoenix, Whittier, Austin, and Dallas) for not matching the control area closely enough to the study area in demographic terms. This does not undermine the County's ability to rely on them, inasmuch as we have rejected the argument that a municipality may only rely on studies employing the scientific method. See Daytona Grand, 490 F.3d at 881. For this reason, we are also unpersuaded by Dr. Fisher's criticism that some of the studies have small sample

26

sizes (Indianapolis; Oklahoma City), only measure data over the course of one or two years (Phoenix; Austin), or lack empirical data (Houston 1997; Amarillo; Seattle). See id.[11]

Dr. Fisher also pointed out that a few of the studies offer some findings that are inconclusive. Again, we are unpersuaded because these studies still draw other findings that are conclusive. We repeat that "[a]lthough the burden lies with the municipality, a court should be careful not to substitute its own judgment for that of the municipality" and should remember that "the municipality's legislative judgment should be upheld provided that it can show that its judgment is still supported by credible evidence, upon which it reasonably relies." Daytona Grand, 490 F.3d at 876 (internal quotation marks omitted). At best, Dr. Fisher has pointed to some problems with some of the studies, but on this ample record this is not enough to carry the day.

Dr. Danner's affidavit, also filed on behalf of Peek-a-Boo, attempts to cast direct doubt on the County's case by undermining the County's rationale for adopting the ordinance, which, among other things, is that sexually oriented businesses cause increases in crime rates. Dr. Danner examined crime rates in the

---

[11] Indeed, in Dr. McCleary's opinion, none of these criticisms is sufficient to wholly invalidate any of the studies, and taken together, they constitute "a very, very compelling literature that shows a consistent consensus finding; sexually oriented businesses pose crime-related secondary effects."

27

County based on crimes known to police in the following offense categories: rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft. He also tracked calls for police service, comparing two sexually oriented businesses with twelve non-adult businesses in the same area. Dr. Danner opined that the evidence was insufficient to conclude that the two adult establishments caused crime-related secondary effects "beyond what would be normally expected" for non-adult alcohol-serving establishments.

Dr. Danner's affidavit, however, did not address the County's findings regarding the correlation between sexually oriented businesses and other crimes, such as prostitution, lewdness, public indecency, illicit sexual activity, illicit drug use, and drug trafficking. What's more, there are serious methodological problems with Dr. Danner's findings. This Court has found that wholesale reliance on data based on crimes that are reported to the police may lead to an underestimation of the total number of crimes, since certain crimes, such as lewdness and prostitution, are rarely reported. See Daytona Grand, 490 F.3d at 882-83. Likewise, there are methodological problems with estimating crime rates simply based on calls for police services: Dr. McCleary opined that there are far more calls than there are actual incidents of crimes, and most crimes do not in fact come to the attention of the police through calls from victims or witnesses.

There are also problems with Richard Schauseil's affidavit, which avers that the County's sexually oriented businesses do not negatively affect commercial property value. First, Mr. Schauseil measured the assessed value of properties, and the County's expert Shawn Wilson cautioned that assessed values are far less accurate than appraisal values. Second, Ms. Wilson observed that Mr. Schauseil's study drew a comparison of listing prices, which may not be closely related to market value at all. Third, Mr. Schauseil's study analyzed the difference between sale and resale value, which may be explained by generally rising neighborhood property values or improvements to the property itself. Without knowing what improvements took place, it would not be proper to assume that a higher resale value meant that property values in the neighborhood were rising.

The bottom line is that the County has presented a substantial body of evidence to support its rationale for adopting the ordinance. Peek-a-Boo has failed even to address much of that evidence at all, and it has failed to show that the County's rationale or this body of evidence was unreasonable.

### III.

Peek-a-Boo also claims that in deciding <u>Daytona Grand</u> and <u>Flanigan's Enterprises, Inc. of Georgia v. Fulton County</u>, 596 F.3d 1265 (11th Cir. 2010) ("<u>Flanigan's II</u>"), this Court impermissibly overruled <u>Krueger v. City of Pensacola</u>,

29

759 F.2d 851 (11th Cir. 1985), Flanigan's Enterprises, Inc. of Georgia v. Fulton County, 242 F.3d 976 (11th Cir. 2001) ("Flanigan's I"), and Peek-a-Boo I. We are bound to follow our precedent, and we have done so in Daytona Grand and Flanigan's II. Cases involving the regulation of sexually oriented businesses are of necessity fact-specific, and the answer in each one is largely driven by the nature of the record.

Thus, for example, in Krueger, we found that a Pensacola ordinance banning topless dancing was unconstitutional because the city produced no evidence that crime was a problem at topless bars in the city. 759 F.2d at 854-55. In Flanigan's I, we found it unreasonable for the county to rely on foreign studies concerning secondary effects when the county had conducted its own empirical studies that conclusively undermined its reliance on the foreign studies' findings. 242 F.3d at 986. In contrast, in Daytona Grand, the city of Daytona Beach relied on a significant record of evidence in adopting its ordinance. This record included police reports of criminal activity in and around adult theaters; undercover reports finding violations of city ordinances; specific documentation from the police chief of criminal activity in and around the theaters; data from police dispatchers regarding police calls; expert testimony; studies conducted for other cities that found that adult businesses tend to increase urban blight; studies of urban blight in

30

Daytona Beach itself; controlled laboratory studies of the connection between alcohol and sexual conduct; anecdotal accounts from local business owners of increased crime; and newspaper articles. 490 F.3d at 882.

Similarly, in Flanigan's II, Fulton County relied on the findings of a 337-page report describing a fourteen-day sting operation of strip clubs in the county that resulted in 167 arrests and 166 convictions. 596 F.3d at 1280. The report also included affidavits regarding the impact of the strip clubs on young people in the county; affidavits regarding the clubs' non-criminal negative secondary effects, such as urban blight; and foreign studies. Id. The facts addressed in Daytona Grand and Flanigan's II were significantly different than those found in Krueger and Flanigan's I, so not surprisingly, the outcomes in these cases were different, although the legal principles were the same.[12]

The County has produced a very substantial body of evidence, which it reasonably believed was relevant to its rationale for enacting the ordinance, and Peek-a-Boo has failed to cast direct doubt on this rationale.

Accordingly, the district court's grant of summary judgment in favor of the

---

[12] Peek-a-Boo is also wrong in suggesting that the tool of summary judgment is always inappropriate when analyzing ordinances that attempt to regulate adult dancing establishments. We rejected summary judgment in Peek-a-Boo I because the plaintiffs had met their burden of casting direct doubt on the evidence the County had presented in support of its public nudity ordinance. 337 F.3d at 1271-72.

31

County is **AFFIRMED.**