Michael OCELLO, et al., Appellants,

v.

Chris KOSTER, in his official capacity as Missouri Attorney General, Respondent.

No. SC 91563.

Supreme Court of Missouri, En Banc.

Nov. 15, 2011.

---

J. Michael Murray, Raymond V. Vasvari Jr., Berkman, Gordon, Murray & DeVan, Cleveland, James B. Deutsch, Mark H. Ellinger, Thomas W. Rynard, Blitz, Bardgett & Deutsch LC, Jefferson City, Richard T. Bryant, Kansas City, H. Louis Sirkin, Jennifer Kinsley, Sirkin Kinsley, Cincinnati, for Missouri residents and adult entertainment businesses.

Ronald Holliger, General Counsel, Mark E. Long, Emily Dodge, Attorney General's Office, Jefferson City, Scott D. Bergthold, Chattanooga, for the State.

LAURA DENVIR STITH, Judge.

Michael Ocello, Passions Video Inc., Genova's Chestnut Lounge Inc., and certain other Missouri residents and businesses (collectively "the businesses") appeal the circuit court's grant of judgment on the pleadings against them in their challenge to the validity of sections 573.525 to 573.540, RSMo Supp.2010 [1] ("the Act"), which regulate sexually oriented businesses in Missouri. They argue that the limitations contained in these statutes concerning touching of dancers by patrons, buffer zones around dancers, the banning of nudity in their establishments, alcohol and hours restrictions, and requirements that booths for viewing books and films be open to view violate their freedom of speech as protected by the First Amendment to the United States Constitution. They also assert that, prior to the Act's adoption, the General Assembly violated an aspect of section 23.140, RSMo 2000, regarding a bill's fiscal note and that this violation voids the Act.

For the reasons set forth below, this Court finds that the restrictions are not content-based limitations on speech but rather are aimed at limiting the negative secondary effects of sexually oriented businesses on the health, welfare and safety of Missouri residents. Applying the intermediate level of review that *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437–39, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion), states is appropriate for use in such cases, this Court finds that the statutes are reasonable time, place and manner or comparable restrictions and that the legislature relied on evidence it "reasonably believed to be relevant" to establish a connection between the statutory provisions under attack and the suppression of negative secondary effects of sexually oriented businesses. Accordingly, the Act does not unconstitutionally limit speech. This Court also rejects the argument that any failure to follow statutory procedures governing preparation of a fiscal note amounts to a failure to follow the Missouri Constitution and thereby voids the legislation. The Missouri Constitution does not require fiscal notes or address how they should be prepared. The judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sections 573.525 to 573.540 (the "Act"), adopted by the Missouri legislature in 2010, regulates certain aspects of sexually oriented businesses by: (1) banning nude dancing in public; (2) requiring that semi-nude dancers not touch or come within six feet of customers; (3) prohibiting alcohol in sexually oriented businesses; (4) requiring sexually oriented businesses to close between midnight and 6 a.m.; and (5) requiring viewing booths in sexually oriented

---

1. Unless otherwise specified, all subsequent statutory references are to RSMo Supp.2010.

businesses to be visible from a central operating station.

Before the legislature passed the Act, legislative committees heard extensive testimony and received reports and other evidence from police officers, health officials, dancers, and concerned citizens and business owners related to the connection between sexually oriented businesses and a variety of detrimental secondary effects, including crimes such as prostitution and drug use, health and sanitation problems, and decreased property values.

In addition, the legislature heard from experts such as Dr. Richard McCleary, a professor of social ecology at the University of California–Irvine. Dr. McCleary testified that based on his extensive research—much of which, including numerous scientific studies, was provided to the legislature—sexually oriented businesses increase crime, drug use and other negative effects.

The legislature also reviewed dozens of judicial opinions as well as studies conducted by municipalities and states around the country concerning problems associated with sexually oriented businesses, including increased crime inside and outside those establishments, unsanitary and unhealthy conditions inside the establishments, and the deleterious effect of such businesses on property values and neighborhoods.

The legislature also considered evidence offered by opponents of the legislation. This included: (1) testimony from police officers and business owners who believed that sexually oriented businesses did not cause crime, blight or other negative secondary effects in their neighborhoods; (2) the testimony of Dr. Daniel G. Linz, a professor of communication, law and society at the University of California–Santa Barbara, who disputed the validity of many of the studies relied upon by proponents of the legislation; and (3) studies stating there is little correlation between sexually oriented businesses and crime and other negative secondary effects in the surrounding communities.

After holding these hearings, the legislature adopted the Act. On August 10, 2010, shortly before the effective date of the Act, the businesses filed a two-count petition in the Cole County circuit court challenging its validity. In Count I, the businesses claim that the Act is void because the General Assembly failed to hold a hearing regarding the accuracy of a fiscal note assessing the expected cost of the Act as required by section 23.140 and article III, section 35 of the Missouri Constitution. In Count II, the businesses claim that the Act restricts sexually oriented speech in violation of the First Amendment to the United States Constitution because the evidence that the General Assembly relied on to show that sexually oriented businesses cause negative secondary effects was constitutionally inadequate.

The State filed an answer in which it denied that the Act is unconstitutional or that the manner of its adoption was improper or rendered it void. It attached to its answer and incorporated by reference the legislative record upon which the Act was adopted, including the judicial opinions, crime, health and land use studies and reports, expert testimony, and anecdotal evidence offered by both proponents and opponents of the legislation. It then filed a motion for judgment on the pleadings, arguing that the General Assembly followed proper legislative procedures in passing the Act, that any deviations did not affect the validity of the legislation, and that the General Assembly reasonably had relied on evidence establishing a connection between sexually oriented businesses and negative secondary effects. The State's motion was granted as to both

counts.[2] The businesses appeal. Because they challenge the constitutional validity of section 23.140, appeal is directly to this Court. Mo. Const. art. V, § 3.

## II. STANDARD OF REVIEW

 This Court reviews the constitutional validity of a statute *de novo*. *In re Brasch*, 332 S.W.3d 115, 119 (Mo. banc 2011). A statute is presumed valid, and the Court will uphold it unless it "clearly and undoubtedly" conflicts with the constitution. *Prokopf v. Whaley*, 592 S.W.2d 819, 824 (Mo. banc 1980). This Court "resolve[s] all doubt in favor of the [statute's] validity." *Westin Crown Plaza Hotel Co. v. King*, 664 S.W.2d 2, 5 (Mo. banc 1984).

 In reviewing grant of a motion for judgment on the pleadings, this Court must decide "whether the moving party is entitled to judgment as a matter of law on the face of the pleadings." *RGB2, Inc. v. Chestnut Plaza, Inc.*, 103 S.W.3d 420, 424 (Mo.App.2003). This Court will not "blindly accept the legal conclusions drawn by the pleaders from the facts." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990). "The well-pleaded facts of the non-moving party's pleading are treated as admitted for purposes of the motion." *Eaton v. Mallinckrodt, Inc.*, 224 S.W.3d 596, 599 (Mo. banc 2007). Exhibits attached to the pleadings are incorporated therein and will be considered in determining whether judgment on the pleadings should have been granted. *Rule* 55.12.

## III. FAILURE TO HOLD A FISCAL NOTE HEARING DID NOT IN-VALIDATE THE ACT

 The businesses first challenge the process by which the Missouri General Assembly adopted the Act. The businesses'

argument is grounded on article III, section 35 of the Missouri Constitution, which states in pertinent part:

> There shall be a permanent joint committee on legislative research, selected by and from the members of each house as provided by law. . . . The committee shall meet when necessary to perform the duties, *advisory to the general assembly,* assigned to it by law.

(emphasis added).

The businesses focus the Court's attention on the requirement of article III, section 35 that the joint committee on legislative research (the "Committee") "*shall meet when necessary to perform the duties, **advisory to** the general assembly, assigned to it by law.*" Mo. Const. art. III, § 35 (emphasis added). They argue that because the constitution requires the creation of the Committee, any failure to properly and fully carry out duties assigned to the Committee by the legislature constitutes a failure to fulfill a constitutional duty and, necessarily, voids any legislation so passed.

The businesses suggest that this argument has particular application here. They note that section 23.140 requires that "[l]egislation, with the exception of appropriation bills, introduced into either house of the General Assembly shall, before being acted upon, be submitted to the oversight division of the committee on legislative research for the preparation of a fiscal note," § 23.140.1, and that, once prepared, a fiscal note must "accompany [a] bill throughout its course of passage." § 23.140.3. It is undisputed for purposes of this appeal that initial preparation of the fiscal note was procedurally proper.

Section 23.140 also states that a legislator may challenge or seek to amend the

2. Judgment was granted as to Count I regarding the fiscal note in November 2010 and, as to Count II regarding the alleged First Amendment violation, in January 2011.

contents of a fiscal note by so indicating "in writing ... to the chairman of the legislative research committee and a hearing before the committee or subcommittee shall be granted as soon as possible." § 23.140.3. It is uncontested that a legislator wrote a letter to the chairman of the Committee requesting a hearing related to the Act's fiscal note but that no hearing was held. The businesses argue that this was a deviation from the provisions of section 23.140.3, and that this deviation constituted an inherent violation of article III, section 35 of the constitution, because holding hearings is one of the duties "assigned to [the Committee] by law" pursuant to article III, section 35. The businesses argue that the Act, therefore, is unconstitutional and void.

The businesses' argument fails. Article III, section 35 of the constitution merely requires that the Committee be formed, that it meet and that it perform an advisory role to the General Assembly. The constitution itself does not set out any specific requirements for the Committee, require hearings or establish any specific duties for the Committee. And, importantly here, article III, section 35 does not require preparation of fiscal notes, nor does it mandate hearings related thereto.

■ Of course the legislature has established, in section 23.140, requirements for writing fiscal notes and has set forth methods for challenging and amending them. But the Committee "has only the power granted it by the constitutional provision that creates it." *Thompson v. Comm. on Legislative Research*, 932 S.W.2d 392, 395 (Mo. banc 1996). The General Assembly cannot increase the authority of the Committee beyond the powers set forth in the constitution. *Id.* Article III, section 35 does not state that the legislature must follow the advice of the Committee or that the Committee's failure to correctly carry out its duties as to a particular piece of legislation voids that legislation. The constitution says that the Committee is merely *advisory* to the General Assembly; therefore, the legislature would not have the authority to give the Committee effective veto power over legislation merely by failing to hold a particular hearing. "To hold otherwise would permit the legislature to amend the constitution with a statute." *Thompson*, 932 S.W.2d at 395.

Nor has the legislature attempted to give the Committee such veto power here. While section 23.140 sets out duties the Committee shall perform, it contains no penalty for non-compliance and says nothing about the effect of failing to follow the procedures outlined therein. Neither does it purport to give the Committee power to delay or quash otherwise validly enacted legislation should the Committee fail to fulfill each of its assigned duties completely or timely. The absence of such provisions does not preclude finding that the provision is mandatory when other circumstances and rules of construction so indicate, *see, e.g., State v. Teer*, 275 S.W.3d 258, 261 (Mo. banc 2009), but in the absence of such circumstances the lack of sanctions for failure to comply has been found to mean that the provision is directory only, *see, e.g., State v. Parkinson*, 280 S.W.3d 70, 76 (Mo. banc 2009); *State v. Tisius*, 92 S.W.3d 751, 770 (Mo. banc 2002); *Farmers & Merchants Bank & Trust Co. v. Dir. of Revenue*, 896 S.W.2d 30, 32–33 (Mo. banc 1995).

The businesses submit that while the statute here does not provide a sanction for failure to follow it, it should nonetheless be held mandatory because it involves a failure by the General Assembly to follow applicable procedural rules when enacting a statute. They argue that, in such a case, the resulting statute is constitutionally defective and, therefore, void, even in

the absence of a specifically codified penalty, citing *Hammerschmidt v. Boone Cnty.*, 877 S.W.2d 98 (Mo. banc 1994).

Reliance on *Hammerschmidt* is misplaced. The Court there deemed a bill void after finding a violation of a *constitutional requirement*, contained in article III, section 23, that no bill shall contain more than one subject. *Id.* at 104–05. By contrast, article III, section 35 does not require a fiscal note, much less does it set forth any procedural requirements related to the fiscal note process. Neither does the constitution elsewhere provide that a failure to follow procedural requirements in passing legislation automatically shall void any bill so enacted.[3]

In sum, the constitution merely requires that the Committee be established, that it meet and that it undertake *an advisory role* to the General Assembly. Neither article III, section 35 nor section 23.140 require this Court to invalidate the Act on the basis of a procedural error in regard to the fiscal note for the bill in question.

## IV. THE ACT IS CONTENT–NEUTRAL AND SUBJECT TO INTERMEDIATE RATHER THAN STRICT SCRUTINY

The businesses also allege that the Act is a content-based restriction on speech subject to strict scrutiny because the purpose of the Act is the suppression of sexually oriented speech. Alternatively, the businesses argue that even were the purpose of the Act not to limit speech, it fails to pass intermediate scrutiny because its provisions reduce protected speech and do not serve the substantial government interest in reducing the negative secondary effects of sexually oriented businesses.

■ In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the United States Supreme Court held that the level of scrutiny used to determine whether restrictions on sexually oriented speech are constitutional depends on whether the statutory provisions at issue are considered content-based or content-neutral. *Id.* at 46–48, 106 S.Ct. 925. If restrictions on sexually oriented speech are content-neutral, they will be reviewed under an intermediate scrutiny standard. *Id.*

■ Under an intermediate scrutiny standard, legislation is examined to determine whether: (1) it is aimed at the negative secondary effects associated with the restricted activity and not the content of the restricted speech; (2) it is a time, place and manner restriction and not a total ban on speech; and (3) it is designed to serve a substantial government interest and leaves open alternative avenues of communication. *Renton*, 475 U.S. at 50, 106 S.Ct. 925.

---

3. Indeed, article III, section 30 of the constitution provides, in relevant part:

No bill shall become a law until it is signed by the presiding officer of each house in open session, who first shall suspend all other business, declare that the bill shall now be read and that if no objection be made he will sign the same. If in either house any member shall object in writing to the signing of a bill, the objection shall be noted in the journal and annexed to the bill to be considered by the governor in connection therewith.

By so providing, the constitution offers members of the General Assembly a mechanism by which to challenge perceived violations such as the Committee's failure to hold a fiscal note hearing and to ensure that the governor is made aware of the objection prior to enactment of the legislation. In this case, the record demonstrates that no such objection was lodged. This Court is not called on to address whether other remedies also may be constitutionally permissible.

### A. The Act is Content Neutral and Aimed at Negative Secondary Effects of Speech

Legislation that is focused on reducing the secondary effects of sexually oriented businesses long has been considered "content-neutral." This is because, although the legislation nominally looks at the content of the speech in the sense that it is aimed at sexually oriented conduct, it is nevertheless "content-neutral" if the " 'predominate concerns' motivating [it] '[are] with the secondary effects [caused by the speech], and not with the content of [the speech].' " *Alameda Books, Inc.*, 535 U.S. at 440–41, 122 S.Ct. 1728 (plurality opinion), *quoting, Renton*, 475 U.S. at 47, 106 S.Ct. 925.[4]

By contrast, content-based restrictions are subject to strict scrutiny. *Id. at* 434, 122 S.Ct. 1728. An example of a content-based law would be legislation prohibiting sexually oriented speech based on a desire to suppress the speech itself. *Renton*, 475 U.S. at 46–48, 106 S.Ct. 925. Under strict scrutiny, legislation is presumptively invalid and will be declared unconstitutional unless it is "narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009).

This Court applies these principles here to determine whether the Act is subject to intermediate or strict scrutiny. The express purpose of the Act is set out in its preamble:

[T]o regulate sexually oriented businesses *in order to promote the health, safety, and general welfare of the citizens of this state, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the state.* The provisions of sections 573.525 to 573.537 have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials. Similarly, it is neither the intent nor effect of sections 573.525 to 573.537 to restrict or deny access by adults to sexually oriented materials protected by the [F]irst [A]mendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market. Neither is it the intent nor effect of sections 573.525 to 573.537 to condone or legitimize the distribution of obscene material.

*§ 573.525.1* (emphasis added).

In keeping with these stated purposes, the Act does not ban sexually oriented businesses of any type. Rather, it seeks to reduce negative secondary effects associated with such businesses, including detrimental health and sanitary conditions, prostitution and drug-related crimes both inside and outside these locations, as well as deterioration of the surrounding neighborhoods, by prohibiting nude dancing in

---

4. Justice Kennedy's *Alameda Books* concurrence explains that calling restrictions on sexually oriented speech content-neutral is a legal fiction because such restrictions clearly target speech based on content; they simply do so for the permissible purpose of regulating the secondary effects of the speech rather than the speech itself. 535 U.S. at 448–49, 122 S.Ct. 1728 (*Kennedy, J., concurring*). While believing the "content-neutral" label thus was a misnomer, he agrees with the plurality that intermediate scrutiny, as defined in *Renton* and *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), is still the proper standard of review because the restrictions are justified based on the secondary effects caused by the speech not the content of the speech itself. *Id.* For ease of understanding *this opinion* continues to call such time, place and manner restrictions on sexually oriented speech "content-neutral."

public; requiring no contact and a six-foot buffer between dancers and patrons; banning alcohol in and restricting the operating hours of sexually oriented businesses; and banning the use of closed booths for viewing sexually oriented films or books.

The preamble to the Act also states that the General Assembly found that:

Sexually oriented businesses, as a category of commercial enterprises, are associated with a wide variety of adverse secondary effects, including but not limited to personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation.

§ 573.525.2(1). For these reasons, section 2(3) of the preamble continues by stating that the General Assembly also finds that:

Each of the foregoing negative secondary effects constitutes a harm which the state has a substantial interest in preventing or abating, or both. Such substantial government interest in preventing secondary effects, which is the state's rationale for sections 573.525 to 573.537, exists independent of any comparative analysis between sexually oriented and nonsexually oriented businesses. Additionally, the state's interest in regulating sexually oriented businesses extends to preventing future secondary effects of current or future sexually oriented businesses that may locate in the state.

§ 573.525.2(3). The Act states that its purpose is to provide "content-neutral" time, place and manner or comparable restrictions on sexually oriented businesses so as to limit their secondary effects; therefore, it is subject to intermediate rather than strict scrutiny.

The businesses assert, however, that the second of the three sentences of section 2(3) of the Act's preamble, just quoted, reveals that the true purpose of the Act is not to regulate but rather to suppress sexually oriented speech. That sentence states that the government's "substantial interest in suppressing the secondary effects [associated with sexually-oriented businesses], which is the state's rationale for sections 573.525 to 573.537, exists independent of any comparative analysis between sexually oriented and nonsexually oriented businesses." § 573.525.2(3). The businesses argue that this is an admission that the Act is intended to suppress sexually oriented speech.

The businesses misread the above sentence. It does not state that the legislature adopts the Act regardless of whether it will reduce secondary effects. The sentence is in a series of paragraphs in which the legislature specifically finds that sexually oriented businesses do have negative secondary effects, in which it lists such effects, and in which it says the purpose of the enactment is to reduce such secondary effects.

In the sentence in question, the legislature makes clear that the State's substantial interest in reducing these secondary effects is sufficient to support the legislation. In so doing, it rejects the position of opponents of the legislation that to regulate sexually oriented businesses it must show that such businesses have more substantial secondary effects than do other businesses. Regardless of whether other businesses also have secondary effects, the legislature said, it found that negative secondary effects are associated with sexually oriented businesses and a desire to reduce those effects is the basis for this legislation.

 This determination was within the General Assembly's legislative prerog-

ative. A legislature is free to and does regulate all sorts of businesses through all sorts of health and safety laws. Indeed, such laws take up many chapters of the Missouri statutes.[5] The legislature is not required to undertake comparative studies before enacting such laws. To the contrary, it is well-settled that a legislative body may choose which evil to regulate first and "need not strike at all evils at the same time or in the same way." *Semler v. Oregon State Bd. of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 (1935). In large part for this reason, numerous cases have recognized that the fact that other, less-regulated businesses may also have negative secondary effects does not make regulating sexually oriented businesses "arbitrary, discriminatory, or unreasonable." *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee Cnty.,* No. 8:05–CV–1707, 2009 WL 4349319, *6 (M.D.Fla. Nov. 25, 2009), *aff'd* 630 F.3d 1346 (11th Cir.2011); *accord, Flanigan's Enterprises, Inc. v. Fulton Cnty.,* 596 F.3d 1265, 1281 (11th Cir.2010). This Court agrees.

 The businesses also argue that certain statements of a member of the General Assembly disparaging sexually-oriented businesses demonstrate the legislature's intent to suppress sexually oriented speech. This contention ignores the well-settled principle that "[a court] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *United States v. O'Brien,* 391 U.S. 367,

384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Therefore, assuming one member of the General Assembly sought to suppress sexually oriented speech based on its content, that motive cannot be imputed to the legislature.

For the foregoing reasons, the Act properly is reviewed as a content-neutral restriction on speech; therefore, it is subject to intermediate scrutiny.

*B. Test for Determining Whether the Act Places Reasonable Time, Place and Manner Restrictions on Speech*

Having determined that the legislative restrictions on sexually oriented businesses in question are aimed at the negative secondary effects associated with sexually oriented activity rather than on restricting the speech itself, this Court turns to whether the restrictions meet the other two requirements of *Renton,* 475 U.S. at 46–48, 106 S.Ct. 925, by determining whether they constitute time, place and manner restrictions rather than a total ban on protected speech and whether they are designed to serve a substantial government interest and leave open alternative avenues of communication.

The restrictions that the businesses ask this Court to strike down are: (1) a no-contact requirement; (2) a six-foot buffer requirement; (3) a ban on nude dancing in public; (4) an alcohol ban; (5) an hours-of-operation restriction; and (6) an open-booth requirement. *See* § 573.531.

These restrictions, except for the nudity ban, are all on their face time, place and manner restrictions.[6] While the nudity ban bars nudity entirely, for reasons discussed further below, the United States

---

5. *See, e.g., chapter 311, Liquor Control Laws; chapter 292, Health and Safety of Employees; chapter 196, Food, Drugs, and Tobacco; chapter 572, Gambling.*

6. Further, the businesses do not allege that the restrictions are a total ban on speech.

Supreme Court has held that bans on nudity are to be examined under the same evidentiary standard as that applied to time, place and manner restrictions. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 297, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Therefore, the validity of all of these restrictions will rise or fall based on whether the government has reasonably relied on evidence establishing the restrictions are designed to serve a substantial government interest.

 The United States Supreme Court clarified the method for determining whether restrictions on sexually oriented businesses meet this standard in *Alameda Books*, 535 U.S. at 437–39, 122 S.Ct. 1728 (plurality opinion). The government has the initial burden of showing that it relied on "evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Id.* at 438, 122 S.Ct. 1728, *quoting Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. Little evidence is required to meet this initial burden. *Id.* at 451, 122 S.Ct. 1728 (*Kennedy, J., concurring*). The evidence does not need to be directly related to the government's rationale as long as it "fairly supports" the rationale. *Alameda Books,* 535 U.S. at 438–39, 122 S.Ct. 1728 (plurality opinion). Furthermore, the government "need not 'conduct new studies or produce evidence independent of that already generated by [other government entities]' to demonstrate the problem of secondary effects, 'so long as whatever evidence the [government] relies upon is reasonably believed to be relevant to the problem that the [government] addresses.' " *Pap's A.M.,* 529 U.S. at 296–97, 120 S.Ct. 1382, *quoting, Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. If the government finds it is reasonable to rely on prior judicial opinions that uphold similar restrictions and those opin-

ions fairly support its enactments, that is sufficient to meet this standard. *Id.*

 In addition, in reviewing the government's evidence, courts must show deference to the legislature's superior knowledge of the negative secondary effects caused by sexually oriented businesses. *Alameda Books,* 535 U.S. at 451–52, 122 S.Ct. 1728 (plurality opinion) ("[t]he Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion"). Finally, although the initial burden is slight and the government's findings are entitled to deference, the government cannot rely on "shoddy data or reasoning" to satisfy its burden. *Id.* at 437–39, 122 S.Ct. 1728.

 If the government meets its initial burden, the burden shifts to the challenger to "cast *direct doubt* on [the government's] rationale, either [1] by demonstrating that the [government's] evidence does not support its rationale or [2] by furnishing evidence that disputes the [government's] factual findings." *Id.* (emphasis added). This type of direct doubt must be cast on every rationale the government used to justify its restrictions. *SOB, Inc. v. Cnty. of Benton,* 317 F.3d 856, 863 (8th Cir.2003); *World Wide Video of Washington, Inc. v. City of Spokane,* 368 F.3d 1186, 1196 (9th Cir.2004).

This is a heavy burden. To understand it better, it is helpful to understand what the test does *not* require and what evidence is *not* sufficient to meet the challenger's burden. It is not the usual burden-shifting test used by courts to determine which side will prevail under a preponderance of the evidence test. This is because the issue for First Amendment purposes is not whether a court would find the challenger's evidence on this is-

sue more persuasive than that relied on by the legislature. The government has to show only that the legislature relied on evidence "reasonably believed to be relevant" to establish a connection between its restrictions and the suppression of negative secondary effects. *Alameda Books*, 535 U.S. at 437–39, 122 S.Ct. 1728 (plurality opinion).

In determining whether the government has made such a showing, neither this Court nor any court has the right to reweigh the evidence relied on by the legislature. *G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 639–40 (7th Cir.2003). The court will not look to see whether the challenger has shown an issue of fact exists as to whether the statute's provisions will limit secondary effects. To the contrary, the question is whether the challenger has cast *direct doubt* on the government's rationale—here the prevention of secondary effects—either by demonstrating that the evidence does not support its rationale that the restrictions will limit secondary effects or by demonstrating that, while it appears to do so, the evidence is faulty and does not in fact support the legislature's factual findings. *Alameda Books*, 535 U.S. at 437–39, 122 S.Ct. 1728 (plurality opinion). To meet this burden, challengers cannot simply make conclusory generalized allegations in their pleadings that the restrictions are invalid or are aimed at speech. They must discredit all rationales offered. Unsystematic or anecdotal evidence, or evidence that merely attacks one type of evidence (such as a lack of controlled studies), would not be enough to cast direct doubt on the government's evidence. *Richland Bookmart, Inc. v. Knox Cnty.*, 555 F.3d 512, 527–28 (6th Cir.2009).

If the challenger fails to cast direct doubt on the government's evidence, the intermediate scrutiny test of *Renton*

and *Alameda Books* is satisfied and the government will have established that the legislation is designed to serve a substantial government interest. *Alameda Books*, 535 U.S. at 438–39, 122 S.Ct. 1728 (plurality opinion). In such cases, there is no need for an evidentiary hearing such as the businesses say was required here. Only if the challenger succeeds in casting direct doubt on the government's evidence in either manner described above does "the burden shift[ ] back to the [government] to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* at 439, 122 S.Ct. 1728.

The Court thus turns to the issues of whether the government met its initial burden and whether the challenger businesses cast direct doubt on the government's rationale.

*C. Reliance by Legislature on Evidence Reasonably Believed to be Relevant*

The legislature based its adoption of the provisions now under attack on evidence introduced at legislative hearings. At those hearings, proponents and opponents of the legislation presented voluminous evidence supporting their disparate positions. The State attached to and incorporated in its pleadings the full legislative record of evidence offered both by those supporting and opposing adoption of the Act. That evidentiary record included: (1) judicial opinions; (2) crime, land use and health impact reports; (3) expert testimony; and (4) anecdotal evidence. All of this evidence was appropriately before the trial court for consideration in determining whether the government met its initial burden and whether the challengers undercut it. Rule 55.12; *Gould v. Missouri State Bd. of Registration for Healing Arts*, 841 S.W.2d 288, 290 (Mo.App.1992).

This Court has reviewed this evidence (as well as additional evidence offered in

the trial court below), in determining whether the government met its burden of showing that the legislature relied on evidence "reasonably believed to be relevant" to reducing negative secondary effects of sexually oriented businesses in enacting the provisions now challenged and whether the businesses have cast direct doubt on the government's evidence so as to preclude the entry of judgment on the pleadings.[7]

In so doing, this Court looks at the evidence supporting and casting direct doubt on the particular provisions under attack, rather than taking the challengers' invitation to determine simply whether this Court believes that the challengers have shown that there may be equal or better ways to regulate secondary effects in general. This follows from the fact, noted above, that a challenger of a statute regulating sexually oriented businesses must cast direct doubt on every rationale the government used to justify each separate challenged provision. *SOB, Inc.*, 317 F.3d at 863; *World Wide Video*, 368 F.3d at 1196.

Here, the legislature believed that the approaches it adopted would assist the State in ameliorating the negative secondary effects caused by sexually oriented businesses including, "personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation." § 573.525.2(1). Therefore, this Court will look at each restriction and determine whether the legislature reasonably relied on evidence establishing a connection between the restriction and one or more of these negative secondary effects.

1. *The challengers failed to cast direct doubt on evidence the legislature reasonably relied on regarding negative secondary effects of the open-booth, no-touch and six-foot buffer restrictions.*

▪ The government relied on a number of types of evidence to support the provisions of the Act requiring open booths and establishing a requirement that patrons not touch or come within six feet of the dancers.[8] This evidence included a

---

7. The businesses did not attach any evidence to their initial petition; however, they did attach additional evidence to motions submitted to the trial court. Although this evidence was included in the appellate record, the parties disagree as to whether the evidence was properly before the trial court and included in the record. *See Castle v. Castle*, 642 S.W.2d 709, 711 (Mo.App.1982). Because this Court finds that consideration of the evidence offered by the businesses in the trial court does not change this Court's resolution of the issues before it, this Court need not resolve the parties' disagreement as to whether this evidence was properly before the trial court.

8. Section 573.531 states in regard to these restrictions:

No employee shall knowingly or intentionally, in a sexually oriented business, appear in a semi-nude condition unless the employee, while semi-nude, shall be and remain on a fixed stage at least six feet from all patrons and at least eighteen inches from the floor in a room of at least six hundred square feet.

No employee, who appears in a semi-nude condition in a sexually oriented business, shall knowingly or intentionally touch a patron or the clothing of a patron in a sexually oriented business.

A sexually oriented business, which exhibits on the premises, through any mechanical or electronic image-producing device, a film, video cassette, digital video disc, or other video reproduction, characterized by an emphasis on the display of specified sexual activities or specified anatomical areas shall comply with the following requirements:
(1) The interior of the premises shall be configured in such a manner that there is an unobstructed view from an operator's

study from Tucson, Arizona, documenting the unsanitary conditions in closed booths. The Tucson study found that of the dozens of samples collected from closed booths in ten different sexually oriented businesses more than 88 percent contained semen. The government also relied on testimony from health department officials in Missouri describing the health problems associated with sexually oriented businesses. Among other issues, the officials discussed that people infected with sexually transmitted diseases, including HIV, frequent sexually oriented businesses, and often engage in anonymous and unprotected sex.

In addition to studies and testimony, the government relied on judicial opinions, including *Bamon Corp. v. Dayton,* 923 F.2d 470, 473 (6th Cir.1991), and *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 410–11 (6th Cir.1997). These opinions found, based on testimony from police officers and other government officials, that closed booths and touching or close proximity between dancers and patrons led to unsanitary conditions and the spread of disease.

The United States Supreme Court has held that in meeting its initial evidentiary burden a legislature may reasonably rely on studies, anecdotal evidence and judicial opinions of the type relied on by the Missouri legislature in adopting restrictions on sexually oriented businesses. *Alame-*

*da Books,* 535 U.S. at 434–39, 122 S.Ct. 1728 (plurality opinion); *Pap's A.M.,* 529 U.S. at 296–97, 120 S.Ct. 1382. This is true regardless of whether, as here, some of the evidence concerned other locations and other statutes in other states. The legislature "need not 'conduct new studies or produce evidence independent of that already generated by [other government entities]' to demonstrate the problem of secondary effects, 'so long as whatever evidence the [government] relies upon is reasonably believed to be relevant to the problem that the [government] addresses.' " *Id., quoting Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. As a result, this Court finds the State met its initial burden and the burden shifted to the businesses to cast direct doubt on the government's evidence about closed booths, no-touch policies and buffer zones.

█ To support their challenge to the Act generally, the businesses principally relied on Dr. Linz. Dr. Linz's testimony and studies concerned whether the legislature had chosen the best method of attacking negative secondary effects, and argued that the alleged deleterious effects of sexually oriented businesses on crime and property values are overblown or unsupported, and that such businesses cause no more crime in surrounding areas than do

station of every area of the premises, including the interior of each viewing room but excluding restrooms, to which any patron is permitted access for any purpose;
(2) An operator's station shall not exceed thirty-two square feet of floor area;
(3) If the premises has two or more operator's stations designated, the interior of the premises shall be configured in such a manner that there is an unobstructed view of each area of the premises to which any patron is permitted access for any purpose from at least one of the operator's stations;
(4) The view required under this subsection shall be by direct line of sight from the operator's station;

(5) It is the duty of the operator to ensure that at least one employee is on duty and situated in an operator's station at all times that any patron is on the portion of the premises monitored by such operator station; and
(6) It shall be the duty of the operator and of any employees present on the premises to ensure that the view area specified in this subsection remains unobstructed by any doors, curtains, walls, merchandise, display racks, or other materials or enclosures at all times that any patron is present on the premises.

various other types of businesses.[9] But, even had the legislature given credit to Dr. Linz's views, the evidence in support of its open-booth, buffer zone and no-touching requirements was equally based on evidence that such restrictions would improve sanitation and health within sexually oriented businesses and reduce opportunities for prostitution and other crimes in those businesses. Dr. Linz's views and studies about crime and property values in surrounding areas were not directed toward these issues and could not and did not cast direct doubt on the government's evidence related to health concerns.

 The businesses also offered various affidavits from dancers and business owners. While some of this anecdotal evidence provided alternative views as to whether sexually oriented businesses present health or safety concerns, they simply offered an alternative viewpoint that at best would have supported an alternative conclusion. As set out above, that is not enough. The businesses needed to cast direct doubt on all of the legislature's rationales for adopting these provisions. *See SOB, Inc.*, 317 F.3d at 863. Their evidence largely failed to address, much less cast direct doubt on, the government's rationale for believing that there were health and safety issues that could reasonably be ameliorated by the open-booth, no-touch and six-foot buffer provisions of the Act. As a result, the challengers failed to meet their burden of proof of casting "direct doubt" to shift the burden of proof back to the government. *Alameda Books*, 535 U.S. at 437–40, 122 S.Ct. 1728. The trial court did not err in granting judgment on the pleadings as to these provisions.

**2. *The nudity ban is valid under the evidentiary standard from* Renton *and* Alameda Books.**

 The nudity ban, unlike the others provisions in the Act at issue on this appeal, is a restriction on expressive conduct in the form of a total ban on nudity in sexually oriented businesses rather than a time, place or manner restriction on such nudity.[10] The United States Supreme Court held in *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673, that such a restriction on expressive conduct is valid if: "[1] it is within the constitutional power of the [g]overnment; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

Thereafter, in 1986, the Supreme Court in *Renton* adopted a slightly different test, for time, place and manner restrictions. As described above, that test, as modified by *Alameda Books*, requires the government to show initially that the legislature reasonably relied on evidence that the legislative restrictions would serve the substantial government interest in suppressing the negative secondary effects caused by sexually oriented businesses. *Alameda Books*, 535 U.S. at 437–39, 122 S.Ct. 1728 (plurality opinion). If the government meets this requirement, the burden then shifts to the challengers and, unless they can cast direct doubt on the government's evidence, the evidentiary standard from *Renton* is met. *Id.*

In *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661

---

9. Dr. Linz's testimony and studies are discussed thoroughly below in section IV.B.3.

10. The nudity ban states, "No person shall knowingly or intentionally, in a sexually oriented business, appear in a state of nudity." § 573.531.3.

(1989), the Supreme Court held that because both tests focus on whether the legislation furthers an important governmental interest, the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Ward,* 491 U.S. at 797–98, 109 S.Ct. 2746, *quoting Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Then, in *Pap's A.M.,* 529 U.S. at 296–97, 120 S.Ct. 1382, the Supreme Court held that because of the similarities between the tests, the evidentiary test from *Renton* controls in the case of nudity bans, as it does in the case of time, place and manner restrictions. *Accord, Peek–A–Boo Lounge,* 630 F.3d at 1354–55. As a result, this Court will apply the evidentiary standard from *Renton* to the nudity ban in this case.

In the present case, the legislature principally relied on Supreme Court decisions, as well as numerous federal courts of appeals decisions, upholding nudity bans similar to the one at issue in this case, including *Pap's A.M.,* 529 U.S. at 289–90, 120 S.Ct. 1382. In *Pap's A.M.,* the Supreme Court ruled that nude dancing is a form of expressive conduct, but that it "falls only within the outer ambit of the First Amendment's protection." 529 U.S. at 289, 120 S.Ct. 1382. Therefore, while a public nudity ban "has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, [dancers] are free to perform wearing pasties and G-strings [and][a]ny effect on the overall expression is *de minimis.*" *Id.* at 294, 120 S.Ct. 1382.

The Supreme Court went on to uphold the ban. To support its judgment, it relied almost entirely on citations to its prior opinions in *Renton, Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), which found a connection between sexually oriented businesses and negative secondary effects. *Pap's A.M.,* 529 U.S. at 296–97, 120 S.Ct. 1382. *Pap's A.M.* also credited the city of Erie's reliance on its city council's first-hand knowledge of the negative secondary effects associated with nude dancing in public. *Id.* at 297–98, 120 S.Ct. 1382. The Court found it inconsequential that *Renton* and *American Mini Theatres* dealt with zoning ordinances rather than a nudity ban, holding that *"it was reasonable for Erie to conclude that ... nude dancing was likely to produce the same secondary effects.* And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres."* *Id.* (emphasis added).

Other cases decided by the Supreme Court and numerous federal courts of appeals similarly have affirmed nudity bans in reliance on *Pap's A.M.* and the cases it cited. *See, e.g., Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *Daytona Grand Inc. v. City of Daytona Beach,* 490 F.3d 860, 873–76 (11th Cir.2007); *Peek–A–Boo Lounge,* 630 F.3d at 1355–56. This makes sense, for once the Supreme Court has determined that a nudity ban is a reasonable exercise of government authority in this area, it would be pointless to require governments to relitigate this issue in individual cases. *See Alameda Books,* 535 U.S. at 451–53, 122 S.Ct. 1728 (*Kennedy, J., concurring*).

The legislature also reviewed anecdotal evidence describing the health concerns related to nude dancing. For instance, the legislature heard from a former dancer who explained that dancers constantly rub against stripper poles and lay on the floor and that performing these actions while completely nude leaves their bodies ex-

posed to bacteria, contributing to the spread of disease. This testimony may have caused particular concern in light of a report from Jefferson County, Missouri, in which a health worker discussed the high and increasing incidence of hepatitis, a virus that often is spread through contact with the body fluids of others.

As the analysis above shows, in enacting the nudity ban, the legislature relied on precedent from the Supreme Court and numerous United States courts of appeals as well as anecdotal evidence describing the health concerns related to nude dancing. The businesses did not offer any evidence casting direct doubt on *Pap's A.M.* or any of the other cases relied on by the State, nor did they cast doubt on the government's anecdotal evidence concerning the health problems associated with nude dancing. As a result, the businesses failed to meet their burden of casting direct doubt on the government's evidence; therefore, the trial court properly granted judgment on the pleadings as to this statutory provision.

*3. Ban on Alcohol Use and Restriction on Hours of Operation.*

 The government relied on a variety of evidentiary sources to justify the alcohol ban and hours-of-operation restrictions on sexually oriented businesses,[11] in-

cluding numerous United States courts of appeals opinions upholding both alcohol bans and hours restrictions. For example, in *Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702 (7th Cir.2003), the challenger claimed that the government did not meet its evidentiary burden because it failed to provide reports showing that serving alcohol aggravated the secondary effects associated with sexually oriented businesses. *Id.* at 724–26. The Seventh Circuit relied on *LaRue,* 409 U.S. 109, 93 S.Ct. 390, in rejecting the challenger's claim.[12] *LaRue* found that it was reasonable for the government to conclude that alcohol and erotic dancing should not be combined. *Id.* at 118, 93 S.Ct. 390. *Ben's Bar* explained that the government reasonably could rely on *LaRue* in determining that "barroom nude dancing was likely to produce adverse secondary effects at the local level, even in the absence of specific studies on the matter." 316 F.3d at 725–26.

The legislature also relied on *Schultz v. City of Cumberland,* 228 F.3d 831 (7th Cir.2000), to support its hours-of-operation restriction. *Schultz* upheld a far more restrictive provision requiring sexually oriented business to close between midnight and 10 a.m. Monday through Saturday and all day Sunday. *Id.* at 846. The Seventh Circuit held that the restriction was valid because the government reasonably relied on secondary effects studies showing a

---

11. The restrictions state, "No operator shall allow or permit a sexually oriented business to be or remain open between the hours of 12:00 midnight and 6:00 a.m. on any day. No person shall knowingly or intentionally sell, use, or consume alcoholic beverages on the premises of a sexually oriented business." §§ 573.531.8–9.

12. Although *LaRue* upheld the liquor ban using a rational basis analysis, a later Supreme Court case dealing with restrictions on advertising alcohol, *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), referenced *American*

*Mini Theatres* and *Barnes,* which dealt with adult entertainment restrictions analyzed under intermediate scrutiny. Numerous United States courts of appeals cases have held that *Liquormart's* reference to the earlier cases "makes clear that the [Supreme] Court is of the opinion that adult entertainment liquor regulations, like the ones at issue in *LaRue,* will pass constitutional muster even under the heightened intermediate scrutiny tests outlined in [*American Mini Theatres* and *Barnes*]." *Ben's Bar,* 316 F.3d at 712–713; *Giovani Carandola Ltd. v. Bason,* 303 F.3d 507, 513 n. 2 (4th Cir.2002).

connection between sexually oriented businesses and crime as well as legislative research suggesting that operating sexually oriented businesses at night strained the limited overnight resources of the local police. *Schultz*, 228 F.3d at 846; *see also Flanigan's*, 596 F.3d 1265 (upholding alcohol ban); *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603 (8th Cir.2001) (same); *Andy's Restaurant & Lounge, Inc. v. City of Gary*, 466 F.3d 550 (7th Cir.2006) (upholding hours restriction); *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291 (6th Cir.2008) (same).

As with the nudity ban, in deciding to enact its alcohol and hours-of-operation limitations, the legislature was entitled to and did rely on prior cases finding alcohol and late hours of operation are associated with negative secondary effects.

The legislature also relied on extensive anecdotal evidence of conditions inside sexually oriented businesses that the legislature could find would be improved by its restrictions. In addition to the evidence already noted, this included evidence from the firsthand experiences of dozens of strippers and former strippers who recounted the drug use, prostitution and sexual abuse they frequently faced inside of sexually oriented businesses. For instance, strippers described how men grabbed their breasts, buttocks and genitals in the sexually oriented businesses and how some of their bosses would force them to engage in prostitution with the customers.

The businesses did nothing to challenge the government's reliance on the above cases and anecdotal evidence. Accordingly, it stands unchallenged.

Instead, the businesses attacked the government's additional reliance on dozens of studies showing a connection between sexually oriented businesses and increased crime and lower property values. Some of these studies also found that alcohol and late-night operating hours contributed to these negative secondary effects. For instance, a study from Dallas, Texas, found that operating late at night contributed to the crime risk by encouraging loitering, which attracted prostitutes. In another study, conducted by the American Center for Law and Justice, researchers found that alcohol service increased the negative secondary effects associated with sexually oriented businesses. The government also relied on expert testimony from Dr. McCleary, who found that criminological theory predicted alcohol would increase crime at sexually oriented businesses by lowering patrons' inhibitions, thereby making them more susceptible to predatory criminals.

The businesses sought to cast direct doubt on this evidence in a number of ways. First, they submitted affidavits from Missouri residents, and even from a former agent of the Missouri Division of Alcohol and Tobacco Control, recounting their beliefs that sexually oriented businesses do not cause harmful secondary effects. In addition, they offered affidavits from other dancers, sexually oriented business owners and neighboring residents, who said they believed that sexually oriented businesses provide high-paying, stable jobs and help maintain well-kept safe communities.

■■■ The legislature was free to rely on the businesses' anecdotal evidence in deciding whether to adopt one or more of the proposed restrictions on sexually oriented businesses, but it found the contrary evidence more persuasive. This it was entitled to do. As the Sixth Circuit noted in *Richland Bookmart*, simply offering conflicting anecdotal evidence cannot meet the challenger's burden of casting direct doubt on the government's evidence because

such evidence "suggests merely that the [legislature] 'could have reached a different conclusion during its legislative process' with regard to the need to regulate . . . sexually oriented businesses." 555 F.3d at 527–28, *quoting, Daytona Grand,* 490 F.3d at 881. "[E]vidence suggesting that a different conclusion is also reasonable does not prove that the [legislature's findings] were impermissible or its rationale unsustainable." *Id.* This is because the government "does not bear the burden of providing evidence that rules out every theory . . . that is inconsistent with its own." *Alameda Books,* 535 U.S. at 437, 122 S.Ct. 1728 (plurality opinion). It merely has to show that it relied on evidence "reasonably believed to be relevant" to establishing a connection between the Act and the suppression of negative secondary effects. *Id.* at 437–38, 122 S.Ct. 1728.

 The businesses also relied on testimony, studies and an affidavit from Dr. Linz to try to cast direct doubt on the government's evidence about the need to ban alcohol in and restrict the hours of sexually oriented businesses. Dr. Linz claimed that many of the studies were not scientifically sound because they were not based on empirical studies comparing the incidence of crime and the change in property values between areas with sexually oriented businesses and areas with other types of late-night businesses. He believes that such empirical studies are necessary to get a true picture of the effect of sexually oriented businesses, and he says that his studies show that other businesses cause at least as much crime and lowering of property values as do sexually oriented businesses. Similarly, Dr. Linz also argues that, while the studies relied on by the State do show a correlation between sexually oriented businesses and crime and reduced property values in the areas surrounding sexually oriented businesses, the correlation is not significant and it is unclear that sexually oriented businesses caused these negative effects because the studies used improper control groups, limited measuring times and non-random surveys. Basically, he argues that the studies did not meet the standards required of controlled scientific studies.

While it is evident that Dr. Linz would require such empirical and controlled studies before adopting statutory provisions similar to those in the Act, the legislature made it clear in the very sentence discussed in section IV.A. above that it rejected Dr. Linz's belief that such comparative studies are necessary, stating:

[the government's] substantial interest in suppressing the secondary effects [associated with sexually oriented businesses], which is the state's rationale for sections 573.525 to 573.537, exists independent of any comparative analysis between sexually oriented and nonsexually oriented businesses.

*§ 573.525.2(3).* This the legislature was free to do, for the United States Supreme Court itself has stated that such empirical or scientific studies are simply unnecessary. It rejected a similar suggestion that empirical evidence that a particular approach will work must be offered before the legislature may enact restrictions on sexually oriented businesses, stating "[the dissent] asks the [government] to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully [reduce secondary effects]. *Our cases have never required [the government] to make such a showing . . . ." Alameda Books,* 535 U.S. at 439–40, 122 S.Ct. 1728 (plurality opinion) (emphasis added).

 The Supreme Court's refusal to require empirical studies follows from its belief that the government should be given

a "reasonable opportunity to experiment with solutions" to the problems caused by sexually oriented businesses. *Renton,* 475 U.S. at 52, 106 S.Ct. 925. Such experimentation is not possible if the government first must study empirical data and make controlled comparisons before it can even undertake the experiment. Therefore, the Supreme Court has held that it is reasonable for a legislature to enact a statute that is supported merely "by appeal to common sense." The government does not need to conclusively prove that its restrictions will reduce negative secondary effects, but only that the evidence "fairly supports" the rationale for the legislation. *Alameda Books,* 535 U.S. at 437–40, 122 S.Ct. 1728 (plurality opinion).

The Eleventh Circuit relied on these principles in *Peek–A–Boo Lounge.* It found insufficient the challenger's criticisms of the government's studies based on allegedly inadequate control groups, sample sizes, length of data study and lack of empirical data, stating that the government is not precluded from relying on studies that do not use the scientific method. *Peek–A–Boo Lounge,* 630 F.3d at 1359.

In addition to criticizing the government's studies, Dr. Linz also presented his own studies that he believed affirmatively showed little or no correlation between sexually oriented businesses and increased crime. While the legislature was free to accept this evidence, the fact that Dr. Linz so firmly believes it to be true does not mean the legislature also must accept it. For instance, Dr. McClearly noted that many of Dr. Linz's studies just measure the number of 911 calls originating from different areas and conclude that sexually oriented businesses did not cause an increase in such calls. The crimes caused by sexually oriented businesses, however, are often so-called victimless crimes such as

prostitution and drug dealing. These crimes rarely are reported because there is no "victim" to report the crime. *See Daytona Beach,* 490 F.3d at 882–83 (questioning experts' studies that relied on 911 call data because "many crimes do not result in calls to 911 . . . especially . . . for crimes, such as lewdness and prostitution"). Therefore, a lack of additional 911 calls would not necessarily mean such "victimless" crimes were not occurring, particularly in the face of the substantial anecdotal evidence and other studies mentioned earlier showing there was such a connection.

To the extent that Dr. Linz's studies and criticisms were valid, they at best show that the legislature could have reached a different conclusion about the connection between sexually oriented businesses and crime and property values. As repeatedly noted, however, this is not sufficient to cast direct doubt on the government's evidence because "evidence suggesting that a different conclusion [about the relationship between the government's restriction and negative secondary effects] is also reasonable does not prove that the [government's] findings were impermissible or its rationale unsustainable." *Richland Bookmart,* 555 F.3d at 527–28.

This principle has particular application here, for Dr. Linz's criticisms and studies addressed only his belief that sexually oriented businesses do not lead to greater neighborhood crime or to a loss of property value. His evidence did not address and so did not cast direct doubt on the legislature's adoption of such measures to attack crime, health, prostitution and drug issues within the businesses themselves based on the prior cases, anecdotal reports and specific studies relied on by the legislature. The trial court did not err in granting judgment on the pleadings as to

the alcohol and hours-of-operation restrictions.

### 4. Proportionality Test

█ Finally, the businesses argue that even if the government met its evidentiary burden under *Renton* and *Alameda Books,* the Act is nevertheless unconstitutional under the proportionality test established by Justice Kennedy's controlling concurrence in *Alameda Books.*[13]

The proportionality test arose from Justice Kennedy's concern that the plurality's analysis in *Alameda Books* did "not address how speech will fare under the [statute]." 535 U.S. at 449–50, 122 S.Ct. 1728 (*Kennedy, J., concurring*). Justice Kennedy explained that the government is not permitted to reduce secondary effects by the simple expedient of reducing the amount of protected speech that occurs, even though it may be logical to assume that fewer sexually oriented businesses will mean fewer customers and so fewer secondary effects. *Id.* Therefore, courts should look to whether the statutes in question leave "the quantity and accessibility of speech substantially intact." *Id.*

The businesses claim that the Act violates this principle because its restrictions have caused sexually oriented businesses' revenue to decline, forcing many to close, thereby substantially reducing the quantity of sexually oriented speech. The businesses' overread Justice Kennedy's concurring opinion. He did not state that the government could not adopt any statute that reduced patronage of sexually oriented businesses or affected their income. He said that a legislature could not adopt statutes that were effective in reducing secondary effects *only because* they re-duced the opportunities for speech, such as by barring more than a certain number of businesses from locating in a community without there being alternative locations for such speech. For this reason, some courts have questioned whether Justice Kennedy's proportionality test has any logical application at all where, as here, the restrictions at issue do not relate to zoning but instead pertain to the clothing and activities within the business itself. *See, e.g., Fantasy Ranch, Inc. v. City of Arlington,* 459 F.3d 546, 562 (5th Cir.2006); *Ctr. for Fair Pub. Policy v. Maricopa Cnty.,* 336 F.3d 1153, 1162 (9th Cir.2003).

In any event, even if applicable, it is evident that Justice Kennedy's concern was with protecting opportunities to engage in the protected aspects of speech at issue in sexually oriented businesses, not with protection of the economic interests of adult businesses in and of themselves by permitting unprotected conduct to occur at the location of the expressive speech.

█ Indeed, at least since *Renton,* the Supreme Court has held that the "economic impact" of a statute regulating sexually oriented businesses is not relevant in determining whether the statute is valid under the First Amendment. 475 U.S. at 54, 106 S.Ct. 925, *quoting Young,* 427 U.S. at 78, 96 S.Ct. 2440 (*Powell, J., concurring*). The proportionality test does not affect this principle. Its concern is not with the economic impact of a statute but rather any intrinsic limitations on speech embodied in the statute. *Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 667 (9th Cir.1996); *Ben's Bar,* 316 F.3d at 726–27 (upholding alcohol ban even though many

---

**13.** Justice Kennedy's concurrence provided the crucial fifth vote in *Alameda Books,* and because it was the narrowest opinion, it is controlling *under Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). *Ctr. for Fair Pub. Policy v. Maricopa Cnty.,* 336 F.3d 1153, 1161 (9th Cir.2003).

businesses would not be viable without the ability to serve alcohol).

In this case, the restrictions in question reduce negative secondary effects while "leaving the quantity and quality of speech substantially intact." *Alameda Books*, 535 U.S. at 449–50, 122 S.Ct. 1728 (*Kennedy, J., concurring*). The only restrictions that place intrinsic limitations on speech are the nudity ban and the hours-of-operation restriction. As previously noted, the Supreme Court has specifically stated that even if a nudity ban "has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, [dancers] are free to perform wearing pasties and G-strings [and][a]ny effect on the overall expression is *de minimis*.' " *Pap's A.M.*, 529 U.S. at 294, 120 S.Ct. 1382. This statement makes clear that the Supreme Court believes that nudity bans reduce negative secondary effects while placing a minimal burden on speech. The nudity ban at issue in this case is valid under the proportionality test.

Based on the evidence discussed above, the legislature reasonably determined that the overnight hours are a particularly troublesome time for sexually oriented businesses to operate; so, closing the businesses at night should substantially reduce negative secondary effects. Forcing sexually oriented businesses to close overnight, however, will not substantially reduce the quantity and availability of sexually oriented speech because such businesses still will have an ample amount of time, 18 hours a day, to convey their erotic message. *84 Video/Newsstand, Inc. v. Sartini*, —— Fed. Appx. ——, ——, No. 09–3920, 2011 WL 3904097, at *13 (6th Cir. Sept. 7, 2011) (finding a midnight to 6 a.m. hours restriction left open ample time to convey sexually-oriented speech when the secondary effects are less severe). Because the hours-

of-operation restriction, like the nudity ban, only places a minimal burden on protected speech it is valid under Justice Kennedy's proportionality analysis.

The other restrictions in the Act place no intrinsic limitations on protected speech but instead restrict opportunities for conduct that *does not* receive First Amendment protection. Challengers concede there is no First Amendment right to touch or sit within a few feet of erotic dancers, to read books and watch movies in a closed booth, or to drink alcohol throughout the night while so doing. Instead the protected First Amendment right is to dance expressively, to read books and to view videos. The legislation does not restrict the right to engage in these protected activities directly, and its hours and nudity restrictions are minimal and reasonable for the reasons noted above. It simply prohibits such illegal and unsanitary conduct as touching dancers, sexual conduct with or without clothes, and use of closed booths for masturbation or for sex between those in adjoining booths.

As such, to the extent that the no-touch, six-foot buffer, alcohol ban and open-booth restrictions reduce patronage at sexually oriented businesses, it is not because the restrictions unduly reduce speech but because they reduce the very types of secondary effects that the government is entitled to and intends to reduce. That this reduction in secondary effects may make these businesses less appealing to some of their former patrons is not the result of the government restricting free speech but simply demonstrates that it was not speech that drew those customers to the establishments.

Protecting the economic security of these establishments by allowing its customers to engage in non-speech related activities is not protected by the First Amendment and the unprotected activities

are subject to reasonable government restrictions of the type at issue here. The Act places only minimal restrictions on speech and does not disproportionately limit speech.

## V. CONCLUSION

As the Supreme Court stated, it is not the judiciary's "function to appraise the wisdom of [the government's] decision to [regulate] adult theaters" or other adult businesses based on such evidence. *Renton*, 475 U.S. at 52, 106 S.Ct. 925. Instead the question is limited to (1) whether the government reasonably relied on evidence fairly supporting its rationale for regulating sexually oriented businesses; and (2) whether the challenger succeeded in casting direct doubt on the government's evidence.

In the present case, the government reasonably relied on a plethora of evidence. While the businesses attacked and sought to undermine some of this evidence, they failed to cast direct doubt on other evidence or on the government's rationale of trying to limit the negative secondary effects within the establishments themselves. For these reasons, this Court finds that the government presented at least some evidence to support the legislature's reasonable belief that the restrictions in question are designed to serve the substantial government interest in minimizing the negative secondary effects caused by sexually oriented businesses. Under the test set out by the United States Supreme Court in *Renton* and *Alameda Books*, this is sufficient to justify the legislation. As such, the Act does not violate article III of the Missouri Constitution or the First Amendment to the United States Constitution. Accordingly, the judgment of the trial court is affirmed.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and PRICE, JJ., and FRANCIS, Sp.J., concur.

DRAPER, J., not participating.