[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15270
Non-Argument Calendar
_____

D.C. Docket Nos. 0:15-cv-62315-JIC,
0:15-cv-62329-JIC

CORNELL RESTAURANT VENTURES, LLC,
a.k.a. Pure Platinum,
MJP & JWC, INC.,
JILCO, INC.,
MRG OF SOUTH FLORIDA, INC.,
d.b.a. Solid Gold,

                                                        Plaintiffs-Appellants,

versus

THE CITY OF OAKLAND PARK,
SHERIFF SCOTT ISRAEL,
in his official capacity as Sheriff of Broward County,
CITY OF OAKLAND PARK,

                                                        Defendants-Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 8, 2017)

Before HULL, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Appellants in this case include Cornell Restaurant Ventures, LLC; MJP & JCW, Inc.; Jilco, Inc.; and MRG of South Florida, Inc. (the "Owners"). They are the owners and operators of the adult-entertainment clubs known as "Pure Platinum" and "Solid Gold," and they appeal the district court's grant of summary judgment to the City of Oakland Park ("City") on the Owners' complaint challenging the City's sexually oriented business licensing regulations. On appeal, the Owners advance two main arguments: (1) enforcement of the licensing regulations against Pure Platinum is barred by a permanent injunction entered by a United States district court in 1987; and (2) there is a genuine issue of material fact as to whether the regulations violate the First Amendment.

We affirm the district court. The 1987 permanent injunction does not prevent the City from enforcing its licensing regulations because, as the court correctly found, the injunction simply "does not concern the licensing regulations at issue in this case." The Owners' First Amendment challenge to the licensing regulations also fails. We have upheld the constitutionality of regulations that were materially similar to the ones at issue here, and the Owners have not produced sufficient evidence to survive summary judgment by casting "direct doubt" on the City's evidence and rationale for enacting the regulations.

2

## I.    Background

A. <u>The 1987 Injunction against the City's 1977 Regulations</u>

In 1977, the City of Oakland Park enacted a zoning regulation that prohibited adult-entertainment clubs from operating within 1,000 feet of a church or school.  Oakland Park Code § 24-28A.2.  At the time, Art Stock's Playpen—a now-defunct adult-entertainment club that was replaced by the Owners' Pure Platinum in the same location—did not conform to this requirement.  But because the 1977 ordinance contained a grandfather clause, Playpen was allowed to continue operating despite its non-conformance.  *Id.* § 24-28A.5 ("The provisions of this ordinance shall not be construed to be retroactive . . . .").

In 1987, Playpen shut down for renovations.  Upon reopening, the City took the position that Playpen—now operating under the name Pure Platinum—no longer qualified for the grandfather clause's protection and tried to shut down the establishment.  Asserting that the grandfather clause still applied, Pure Platinum sought an injunction in United States district court against the enforcement of the 1977 ordinance.  On July 24, 1987, the district court in that case ruled that the grandfather clause applied and granted Pure Platinum a permanent injunction against enforcement of the 1977 ordinance.[1]

---

[1] The injunction provided, "The City of Oakland Park is permanently enjoined from enforcing § 24-28A.2 of the Oakland Park Code against the property at 3411 North Federal Highway, Oakland Park, Florida, for so long as the operation of a 'Group D Cabaret' is not

3

B. 2004 Legislative Changes

In 2004, the City amended its adult-entertainment zoning regulations. *See* Oakland Park Code § 24-73(D)(2). The changes included two additional zoning requirements: (1) adult businesses must exist within one of five designated districts only; and (2) adult businesses cannot operate within 800 feet of a home, church, school, or any other adult business. The 2004 zoning amendment preserved the grandfather clause created in the 1977 version of the ordinance.

In addition to amending the zoning regulations in 2004, the City also enacted licensing regulations for adult businesses that prohibited these businesses from engaging in certain conduct. *See* Oakland Park Code § 7-147. Notably, the licensing regulations prohibit full nudity, employee-patron physical contact, and the sale and consumption of alcohol.

Unlike the zoning regulations, though, the licensing regulations do *not* include a grandfather clause. In fact, the regulations expressly state that they apply to "all sexually oriented businesses . . . regardless of whether such businesses or activities were established or commenced before, on, or after the effective date of this article . . . ." Oakland Park Code § 7-146. Although the licensing regulations

---

abandoned at that location. For purposes of this Order, the nonconforming use shall be considered abandoned, according to the terms of the ordinance itself, if the occupational license is not renewed in timely manner."

4

do not contain a grandfather clause, they nonetheless provided existing businesses with 180 days to comply from the date of enactment of the regulations.

C. The Settlement Agreements

MJP & JWC, Inc., was the superior leaseholder of the real property upon which Pure Platinum lies. On January 1, 2000, it sub-leased that property, 3411 North Federal Highway, to D.B.D. Management, the then-operators of Pure Platinum. After the 2004 statutory changes were adopted, D.B.D. Management brought suit against the City, arguing that the 2004 regulations were unconstitutional. Around the same time, Jilco, Inc., and MRG of South Florida, Inc.—the companies that were, at that point, in the process of opening the Solid Gold strip club in a different location—brought a similar suit against the City.

The City entered a settlement agreement with D.B.D. Management that granted Pure Platinum an eleven-year exemption from compliance with the 2004 licensing regulations. The City also granted Solid Gold an eleven-year exemption from the 2004 zoning and licensing regulations but with one condition: after the eleven years passed, Jilco, Inc., and MRG would have to terminate the operation of Solid Gold as an adult business at its then-current location because it did not comply with the 2004 zoning regulations. Unlike Solid Gold, however, after the eleven years passed for Pure Platinum, D.B.D. Management was still to be

5

permitted to operate the club as long as it began complying with the licensing regulations.

At some point after D.B.D. Management signed the settlement agreement on behalf of Pure Platinum, MJP & JWC, Inc., conveyed the rights to operate Pure Platinum to Cornell Restaurant Ventures, LLC, the owners and current operators of Pure Platinum.[2]

D. The 2015 Action

As the eleven-year regulatory hiatus approached its end, the City reminded Pure Platinum and Solid Gold that they would soon need to comply with their obligations under the 2004 settlement agreements. Specifically, the City informed Pure Platinum that it would have to begin complying with the City's licensing requirements, and the City informed Solid Gold that it would need to cease operating its adult business entirely at that location.

In response to the City's letters, both Sold Gold and Pure Platinum brought this suit against the City and moved for preliminary injunctions against the City's pending enforcement of the licensing regulations, zoning regulations, and settlement agreements. The district court granted in part and denied in part Plaintiffs' motion for a preliminary injunction. Specifically, the court granted an

---

[2] Cornell Restaurant Ventures, LLC, is an enterprise founded by Michael J. Peter, who is also the founder and sole director of MJP & JWC, Inc.

injunction against enforcement of the zoning regulations and Solid Gold's settlement agreement to the extent that these things would force Solid Gold to entirely cease its adult-entertainment operations. But the court declined to issue an injunction against enforcement of the City's licensing regulations. So both Pure Platinum and Solid Gold were permitted to operate as adult businesses at their present locations as long as they complied with the 2004 licensing regulations.

Pure Platinum and Solid Gold filed an interlocutory appeal in this Court challenging the court's decision to deny their request for an injunction with respect to the licensing regulations. While the appeal was pending, the district court entered its final judgment in the action. In response, Pure Platinum and Solid Gold filed an unopposed motion to dismiss the interlocutory appeal as moot, which this Court granted on August 5, 2016.

The ruling at issue in this appeal is the district court's grant of partial summary judgment to the City in July 2016. The court determined that (1) the City's 2004 licensing regulations passed constitutional muster under the First Amendment and (2) the 1987 injunction did not enjoin the City from applying the licensing regulations to Pure Platinum. The court specifically found that the Owners had failed to produce sufficient evidence to cast doubt on the ample record the City relied upon in concluding that the licensing regulations advanced the substantial government interest in combating the harmful secondary effects of

7

sexually oriented businesses. Following a bench trial, the court found in favor of Solid Gold on its challenge to the zoning regulations and the 2004 settlement agreement and entered a permanent injunction consistent with its preliminary injunction. After entry of final judgment, the Owners brought this appeal.

## II.    Standard of Review

We review the district court's grant of summary judgment *de novo*, applying the same standards that governed the district court and drawing all reasonable inferences in favor of the non-moving party. *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty, Fla. (Peek-A-Boo II)*, 630 F.3d 1346, 1353 (11th Cir. 2011). Summary judgment is appropriate when the moving party demonstrates that no disputed issue of material fact exists. *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016); Fed. R. Civ. P. 56(a). The constitutionality of a statute is a question of law that we review *de novo*. *Peek-A-Boo II*, 630 F.3d at 1353.

## III.    Discussion

The Owners offer two central arguments in support of their position that the district court erroneously granted summary judgment to the City on their challenge to the City's licensing regulations. First, the Owners claim that the licensing regulations cannot be enforced against Pure Platinum because doing so would operate as a "complete nullification and violation" of the 1987 permanent injunction. Second, the Owners contend that the licensing regulations violate the

First Amendment and that they presented sufficient evidence to cast direct doubt on the evidence the City relied upon in enacting the licensing regulations. We address each argument below.

A. Alleged Violation of the 1987 Injunction

The Owners first argue that permitting the City to enforce the licensing regulations violates the 1987 injunction. According to the Owners, the 1987 injunction "enjoined the City of Oakland Park from prohibiting the operation of a 'Group D Cabaret,' which included non-obscene nude dancing" and the sale and consumption of alcoholic beverages. Because the licensing regulations prohibit full nudity and alcohol, the Owners argue that forcing them to comply violates their rights created by the 1987 injunction.

But, in fact, the 1987 injunction never gave the Owners a right to sell alcohol or offer full nudity. The "right" created by the 1987 injunction was much narrower: it provided that the establishment be protected from enforcement of the 1977 zoning regulations specifically contained in § 24-28A.2 of the then-existing Oakland Park Code based on the zoning regulations' grandfather clause. The 1977 regulations prohibited strip clubs from operating within 1,000 feet of a school. As the City notes, the 1987 order protected Pure Platinum from the 1,000-foot separation regulation for one very simple reason: the 1977 regulations contained a grandfather clause that protected preexisting non-conforming entities. Because

Playpen existed (1) within 1,000 feet of a school (non-conforming) (2) prior to the adoption of the 1977 regulations (pre-existing), the statute plainly protected its continued operation.

Thus, the 1987 injunction was based solely on an interpretation of a grandfather clause that protected preexisting non-conforming entities from enforcement of a zoning regulation that limited where strips clubs may be located. But the licensing regulations at issue concern something different—how strips clubs may operate.   And while the 2004 zoning regulations maintain the grandfather clause contained in the 1977 regulations, *see* Oakland Park Code § 24-73(F), the City's 2004 licensing regulations expressly apply to "all sexually oriented businesses . . . regardless of whether such businesses or activities were established or commenced before, on, or after the effective date of this article . . . ," Oakland Park Code § 7-146.  Because the 1987 order applied to the enforcement of the zoning regulations only, it has no force with respect to the licensing regulations at issue here.  For this reason, we reject the Owners' argument that the City's 2004 licensing regulations violate the 1987 injunction.

B. The City's licensing regulations are constitutional.

The Owners next argue that the district court erred in concluding that the licensing regulations themselves did not violate the First Amendment.  Specifically, the Owners contend that they presented sufficient evidence at

summary judgment to create genuine issues of material fact about whether the licensing regulations advance a substantial government interest.

In *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County (Peek-A-Boo I)*, 337 F.3d 1251, 1264 (11th Cir. 2003), we summarized the differences between the appropriate First Amendment analysis with respect to zoning regulations, on the one hand, and nudity regulations, on the other.  We held that zoning ordinances that regulate the conditions under which adult entertainment businesses may operate should be evaluated under the standards for "time, place, and manner" regulations set forth by the Supreme Court in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–50 (1986), and applied in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring).[3]  *Id.*  Content-neutral public-nudity ordinances, on the other hand, "should be evaluated under the four-part test for expressive conduct set forth in [*United States v. O'Brien*, 391 U.S. 367, 377 (1968)]," and applied in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 279 (2000), *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567 (1991).  *Id.*

The licensing regulations challenged in this case prohibit full nudity, employee-patron physical contact, and the sale and consumption of alcohol.  In these respects, the City's licensing regulations impose the same restrictions as the

---

[3]  We have recognized that Justice Kennedy's concurring opinion in *Alameda Books* represents the Court's holding in that case.  *See Peek-A-Boo II*, 630 F.3d at 1354 n.7.

11

county ordinance at issue in *Peek-A-Boo II*.  *See* 630 F.3d at 1349–50.  As a result, the 2004 licensing regulations, like the county ordinance at issue in *Peek-A-Boo II*, appear to "contain[] provisions that regulate zoning and portions that are generally applicable public nudity restrictions."  *Id.* at 1354; *see id.* at 1350 (describing a prohibition on serving alcohol as a "zoning provision[]).  So, the three-part *Renton* test may apply to some portions of the licensing regulations while the four-part *O'Brien* test may apply to other portions.

Nevertheless, in *Peek-A-Boo II* we found it unnecessary to analyze the provisions separately because Peek-A-Boo challenged on appeal "only whether the ordinance is designed to serve a substantial government interest."  *Id.* at 1354. And "[w]e have concluded that the same standard is used to determine whether an ordinance 'is designed to serve' the government's interest (*Renton* step 3) or 'furthers' the government's interest (*O'Brien* step 2)."  *Id.* at n.8 (listing the elements of both tests) (citing *Peek-A-Boo I*, 337 F.3d 1264–65).  The same reasoning applies here.  Like Peek-A-Boo, the Owners challenge only whether the licensing regulations are designed to serve a substantial government interest. Therefore, we measure both aspects of the licensing regulations against the same standard: are the regulations "reasonably designed to serve a substantial government interest?" *See id.* at 1354–55.

The City asserts that its licensing regulations serve the substantial government interest of reducing the negative secondary effects associated with sexually oriented businesses.[4]  The Owners do not dispute that this is a substantial government interest.  *See Pap's A.M.*, 529 U.S. at 296 ("The asserted interests . . . of combating the harmful secondary effects associated with nude dancing are undeniably important.").

To answer the question of whether the regulations are "reasonably designed" to serve that interest, we apply the following burden-shifting framework, as summarized in *Peek-A-Boo II*:

> [T]he county or municipality first bears the initial burden of producing the evidence that it has relied on to reach the conclusion that the ordinance furthers its interest in reducing secondary effects.  *Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 875 (11th Cir. 2007) (*citing Peek–a–Boo I*, 337 F.3d at 1269).  If the governmental entity has produced "evidence that it reasonably believed to be relevant to its rationale for enacting the ordinance," then the burden shifts to the plaintiff to "cast direct doubt on this rationale," either by showing that the evidence does not support its rationale or by producing evidence disputing the local government's factual findings.  *Id.* at 875–76 (internal quotation marks omitted).  If the plaintiff sustains its burden, the burden shifts back to the government to supplement the record with evidence renewing support for a theory that justifies the ordinance.  *Id.* at 876.

630 F.3d at 1355.

---

[4]  The stated purpose of the licensing regulations is "to promote the health, safety, morals, and general welfare of the citizens of the city" and "to prevent the deleterious secondary effects of sexually oriented businesses within the city, and to prevent illicit activity and undesirable combination of sexually oriented businesses and alcohol consumption."  Oakland Park Code § 7-130(a).

13

To meet its burden, the City did not need to "conduct local studies or produce evidence independent of that already generated by other municipalities to demonstrate the efficacy of its chosen remedy, 'so long as whatever evidence it relie[d] upon [wa]s reasonably believed to be relevant to the problem that [it] addresse[d].'" *Peek-A-Boo I*, 337 F.3d at 1259 (quoting *Pap's A.M.*, 529 U.S. at 296). Thus, the City was permitted to rely on, among other evidence, relevant judicial opinions as well as reports and studies that had been prepared for other municipalities. *See Peek-A-Boo II*, 630 F.3d at 1355–57.

Here, the City clearly met its initial burden. In enacting the 2004 licensing regulations, the City explained its rationale as follows:

> Sexually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects, including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on property values, urban blight, pornographic litter, and sexual assault and exploitation.

Oakland Park Code § 7-130(b)(1). The City further found that the prohibition on employee-patron physical contact would reduce both the opportunity for prostitution and the risk of spreading sexually transmitted diseases. *Id.* § 7-130(b)(2)–(4). The City concluded, "Each of the foregoing negative secondary effects constitutes a harm which the city has a substantial government interest in preventing and/or abating." *Id.* § 73-130(b)(5).

In support of its rationale, the City relied upon a substantial body of evidence, which it reasonably believed was relevant to its rationale of combating the negative secondary effects of strip clubs such as Plaintiffs'. As the district court noted, the record relied upon by the City—including judicial opinions and reports and studies that had been prepared for other municipalities—is "virtually the same legislative record" that we found sufficient to meet the county's burden in support of the substantially similar regulations at issue in *Peek-A-Boo II*. *See* 630 F.3d at 1356. *Peek-A-Boo II* describes this evidence in detail, so we need not do so here, but suffice it to say that the City has provided an "ample foundation that is more than enough to sustain [its] initial burden" under both the *Renton* and *O'Brien* tests. *See id.* at 1356–58.

Because the City met its initial burden of producing evidence that it reasonably believed to be relevant to its rationale, the burden shifts to the Owners "to cast direct doubt on the [City]'s rationale, either by showing that the [City]'s evidence does not actually support its rationale or by producing evidence disputing the [City]'s factual finding." *Id.* at 1357. The Owners have not met this burden.

In support of their burden, the Owners point to the following evidence: an analysis of crime rates in the area around Pure Platinum by Terry Danner, Ph.D., a professor of criminal justice; an affidavit from R. Bruce McLaughlin, a land-planning consultant; and "anecdotal evidence" from the Owners' principals. "The

15

gist of this evidence," according to the Owners, is that Pure Platinum and Solid Gold "did not cause any perceived negative secondary effects." Appellants' Br. at 33 (emphasis omitted). The Owners claim that this evidence stands unrebutted, entitling them to survive summary judgment.

But the Owners' evidence, even if unrebutted, is insufficient to cast "direct doubt" on whether the City "reasonably believed the evidence to be relevant to its rationale in adopting the ordinance." *Peek-A-Boo II*, 630 F.3d at 1358–59. Much of the evidence relied upon by the City, including the judicial opinions and the reports and studies that had been prepared for other municipalities, is simply unaddressed by the Owners.

With regard to Dr. Danner's report, which found that the operation of Pure Platinum did not produce a "uniquely criminogenic" environment as compared to a similar "non-adult oriented" club based on a "preliminary analysis of calls for police service," we have found "methodological problems" with evaluating crime rates based solely on calls for police services. *Id.* One notable problem is that certain crimes, such as lewdness, prostitution, or drug use, often involve non-objecting participants, and "they rarely result in calls to 911." *Daytona Grand, Inc.*, 490 F.3d at 882–83. For that reason, Dr. Danner's analysis does not cast doubt on the City's findings regarding the correlation between sexually oriented businesses and crimes such as "prostitution, . . . lewdness, public indecency,

16

obscenity, [and] illicit drug use and drug trafficking." Oakland Park Code § 7-130(b)(1).

Moreover, neither Dr. Danner's report nor any of the Owners' other evidence casts doubt either on the City's findings that sexually oriented businesses contribute to urban blight and negatively impact property values or its concern with public health and the spread of sexually transmitted diseases. McLaughlin's testimony related to the zoning regulations, which are not at issue in this appeal, and he expressly stated in his deposition that he was not offering an opinion with respect to negative secondary effects associated with sexually oriented businesses. The Owners' principals' affidavits contain little more than bare assertions that their clubs did not cause adverse secondary effects. Such conclusory and unsupported statements generally are not sufficient to create genuine issues of material facts. *See Ellis v. England*, 432 F.3d 1321, 1326–27 (11th Cir. 2005). In any case, the City could still reasonably have concluded that sexually oriented businesses "as a category of commercial uses" produce negative secondary effects even if two such businesses are model citizens.

Nor, as the Owners suggest, does the fact that the City refrained from enforcing the licensing regulations as part of the private settlement somehow indicate that the City's licensing regulations were not actually motivated by or do not advance its stated government interest in combating the negative secondary

17

effects of strip clubs. We do not strike down an otherwise constitutional law on the basis of pure speculation that the legislators may have had some kind of illicit motive. *See O'Brien*, 391 U.S. at 383; *see also Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1309 (11th Cir. 2000) ("Courts are hesitant to inquire into legislators' motives, however, and we will 'not strike down an otherwise constitutional statute on the basis of an alleged legislative illicit motive.'") (quoting *O'Brien*, 391 U.S. at 383); *Int'l Food & Beverage Sys. v. City of Fort Lauderdale*, 794 F.2d 1520, 1525 (11th Cir. 1986) ("[*O'Brien*] teaches against striking down otherwise constitutional legislation on the basis of a speculated illicit legislative motive."); *Krueger v. City of Pensacola*, 759 F.2d 851, 856 (11th Cir. 1985) ("The general judicial reluctance to plumb the legislative psyche does not mandate, however, that we must turn a deaf ear to a record that establishes with unmistakable clarity the actual motives of the legislators in this case."). Here, the Owners have failed to produce evidence that would cause us to conclude that the City had ulterior motives in adopting the licensing regulations.

We likewise do not agree with the Owners' premise that a promise to temporarily withhold enforcement of an ordinance implies that the government does not believe the ordinance furthers an important governmental interest. The City's decision to offer an eleven-year regulatory hiatus in exchange for the settlement of litigation is a reasonable one that falls within the scope of the City's

18

discretion, and we do not find that it constitutes evidence of an impermissible motive or that it undermines the City's rationale in enacting the licensing regulations.

Because the Owners have failed to cast doubt on the validity of the "ample foundation" the City relied upon when enacting the challenged licensing regulations, we hold that the City's licensing regulations are reasonably designed to serve the substantial government interest of reducing the negative secondary effects associated with sexually oriented businesses.

C. The district court properly applied our precedent.

Finally, the Owners rely on various decisions from this Court to argue that the district court erred in evaluating the evidence of secondary effects and to assert that our precedent is internally inconsistent in how it treats secondary-effects evidence. But we rejected similar arguments in *Peek-A-Boo II*. *See* 630 F.3d at 1360–61. And as we noted in that case, "[c]ases involving the regulation of sexually oriented businesses are of necessity fact-specific, and the answer in each one is largely driven by the nature of the record." The closest case on its facts to this one is *Peek-A-Boo II*. Both the regulations at issue and the evidence relied upon by the parties are broadly similar, if not materially indistinguishable, so we follow *Peek-A-Boo II* and reach the same result as we did in that case.

## IV.    Conclusion

19

For the foregoing reasons, we affirm the district court's grant of partial summary judgment in favor of the City on the Owners' challenge to the 2004 licensing regulations on sexually oriented businesses.

**AFFIRMED.**